# PRINCE GEORGE'S COUNTY, MARYLAND v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 67

[No. 56, September Term, 1980.]

*Decided January 21, 1981.*

*Motion for reconsideration filed February 20, 1981; denied March 2, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Robert B. Ostrom, County Attorney,* with whom were *Michael O. Connaughton, Deputy County Attorney,* and *Sherrie L. Krauser, Associate County Attorney,* on the brief, for appellant.

*Kenneth P. Niman,* with whom were *Herbert J. Belgrad, Harriet E. Cooperman* and *Kaplan, Heyman, Greenberg, Engelman & Belgrad* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court.

Presented here is the narrow issue of whether the Prince George's County Public Employees Relations Board (PERB) exceeded its jurisdiction in a hearing on unfair labor practice charges by ordering Prince George's County, through its officers, formally to execute and promptly to transmit to the County Council a collective bargaining agreement which PERB found to have been agreed to by county and union negotiators and to have been approved by the County Executive. We find no jurisdictional defect.

The Charter of Prince George's County, Maryland, Article IX, § 908, grants to county employees the right to organize and bargain collectively. That charter section directs the County Council to provide by law a labor code which shall

include, *inter alia,* "definitions of and remedies for unfair labor practices." Prince George's County Code (1979), subtitle 13A, §§ 13A-101 through 13A-116 comprise the Labor Code.[1]

In February 1979 five locals of the American Federation of State, County and Municipal Employees (AFSCME), which are members of Council 67, began contract negotiations with the County. Each local had an existing labor agreement which expired June 30, 1979. The objective of the multi-local bargaining was to establish a master agreement containing uniform provisions applicable to all bargaining units, with addenda relative to issues specific to each local. Chief negotiator for the union was Paul H. Manner, area representative for Prince George's County. The executive director of Maryland Council 67 was Ernest Crofoot. From about March 14, 1979, the chief negotiator for the County was Allen G. Siegel, a private attorney. He shared negotiating responsibilities with Joseph C. Fagan who in January of 1979 had become director of labor relations for the County. Throughout the relevant period the County Executive has been Lawrence J. Hogan, whose chief administrative officer has been Kenneth Duncan.

Section 102 (g) of the Labor Code provides that the term "employer" means "the County Executive and any individual who represents him or acts in his interests in dealing with employees . . . or any person acting as an agent of said governmental body." Under § 109 (a) the "County Executive, or his designated authorized representative(s) shall represent the employer in collective bargaining . . . ."[2]

---

1. Hereafter, the sections of the Labor Code will be cited without reference to subtitle 13A, *e.g.,* § 101.

2. Section 109 further provides in part as follows:

(e) Any agreement reached by the negotiators shall be reduced to writing and shall be executed by both parties. Such agreement shall be valid and enforced under its terms when entered into, in accordance with the provisions of this law and County Charter.

(f) A request for funds necessary to implement such written agreement and for approval of any provision of the agreement which is in conflict with any County Law, Ordinance, Rule or Regulation . . . shall be submitted to the County Council by the employer within the time schedule provided in the agreement. The County Council may approve or reject such request as a whole. If

In the course of the bargaining, as an issue was resolved by the negotiators, the provision was reduced to writing and the negotiators signed it. Under the agreed bargaining ground rules such items were not open for later discussion except by mutual consent. No new contract was reached by the expiration date of the then contracts. Bargaining continued. Resort was had to federal mediators. The impasse procedures of the Labor Code were invoked. On December 20, 1979 the Impasse Panel certified pursuant to Labor Code, § 112 (a) (2), that all appropriate impasse procedures had been exhausted. This is one of the steps preceding a strike. The parties did return to the bargaining table on February 13, 1980. By about 5:00 p.m. that day, the product of the session was reduced to a two-page, handwritten document (the "tentative agreement"). It was signed for the County by Mr. Siegel and for the union by Mr. Manner and another.

As a result of the rejection by the County Executive of the tentative agreement, the union on February 19, 1980 filed unfair labor practice charges with PERB against the County. These charges were heard by the chairman of the Unfair Labor Practice Panel on March 4, 5 and 6, 1980. The thrust of the County's defense was that its negotiators were not authorized finally to agree to the tentative agreement, that it was subject to final approval by the County Executive, and that he was therefore free to reject it. On March 19, 1980 the hearing officer rendered his findings of fact and conclusions of law in which he held the County to have committed a number of violations.

---

the submission is rejected, the entire agreement shall be returned to the parties for further bargaining and either party may reopen all or any part of the agreement . . . .

(g) If upon approval of the County Council, there is a conflict between the collective bargaining agreement and any rule or regulation adopted by the employer . . . the terms of such agreement shall prevail, except where specifically precluded by Charter or State law. Similarly, County Council, upon approval of such agreement, shall enact such legislation and appropriate whatever funds are required to comply with the collective bargaining agreement.

We now turn to the more significant fact findings of the hearing officer.[3]

> On February 12, 1980, Joseph C. Fagan ... had a "private" meeting with Paul H. Manner .... On that date the parties worked out a general outline of what both sides thought they could successfully agree to and although Fagan did not check with the County Executive he felt that what the union was willing to agree [to] was within the guidelines set by the County Executive ....
>
> At 2:00 p.m. on February 13, 1980, both parties met, with their full negotiation teams in attendance .... Various proposals and counter-proposals were made, with the County team finally caucusing, as Fagan and Siegel said they were going to the "boss," and that they thought they could sell the entire package. Fagan testified that they tried unsuccessfully to reach the County Executive but nevertheless when the County Negotiators came back 25-30 minutes later, Siegel came in with a smile on his face, reached his hand out, said *"We have an agreement,"* and shook Manner's hand. [Emphasis added.] [Thereupon the "tentative agreement" was signed.]
>
> About 9:00 p.m. Fagan was advised by Kenneth Duncan ... that the County Executive would not agree to the Tentative Agreement. About 11:30 p.m. Siegel called Manner and indicated that "we have a problem," explaining that the County Executive was enraged over a newspaper article in *The Washington Star* that day, February 13, 1980, in which the Chairman of the County Council, a political rival, criticized the County Executive and

---

3. The findings of fact in the written opinion of the hearing officer are generally followed by hearing record references. In the quotations which we set forth from that opinion references to the transcript and exhibits are omitted and, for the convenience of the reader, the omissions are not indicated.

which, in the view of the County Executive, made it appear that the settlement reached was forced by the County Council. To offset this impression, Siegel suggested that the parties meet with a Federal mediator and arrive at the same agreement already reached but which would be attributed to the efforts of the mediator, which would take the credit away from the County Council. Manner rejected the proposal.

Also included in the late night phone calls was an exchange between Siegel and Fagan that they should try to get some kind of a statement from AFSCME which would deal with the County Executive's concerns about the involvement of County Council and would help put "salve on the wounds" of the County Executive. This attempt . . . at some point gained Duncan's approval.

On that same evening [Duncan called Crofoot]. Duncan similarly told Crofoot how *The Star* article sent the County Executive into a fury, repeated the concern of the County Executive that it had appeared that he had been forced to the bargaining table by the pressure of the County Council, and stating "no way is he (Hogan) ever going to agree to a contract if the County Council . . . gets any credit for it." At no time did Duncan ever say that the County Executive had any problem with the tentative agreement . . . .

On the morning of February 14, Siegel called Crofoot . . . and suggested that they meet to prepare a statement. Crofoot assented and upon arriving at a designated restaurant was presented with a typed press release which, when Fagan arrived, was being modified by Siegel . . . . Siegel told Crofoot "you sign this and I think we can get the contract."

Although Crofoot refused to criticize [the] County Council . . . a statement was finally agreed upon. No attempt was made to negotiate any new contractual provisions. However, when Siegel reported by

phone to Duncan, and then told Crofoot to talk to him, Duncan informed Crofoot "[N]o statement whatever would salvage the thing now, and . . . [the County Executive] is sitting there now picking the contract apart . . . ." [No joint county-union press release was issued.]

In his opinion the hearing officer identified and resolved, "Major Disputed Areas of 'Fact'." One of these was the issue, "Did the County Executive Approve the Tentative Agreement?" He concluded that "the evidence indicates that the County Executive must have given his negotiators his oral approval of what he understood they agreed to." [4] The

---

4. The complete discussion by the hearing officer on this issue, again with record references omitted, is as follows:

Fagan testified that he and Siegel were going to get the County Executive's approval after they signed the Tentative Agreement, that "we looked at this and thought this was pretty good in light of other communities, municipalities and so forth and thought we'd get the County Executive to buy off on the whole package." However, he did not get to see the Executive although Siegel briefly saw him about an hour later (about 6:00 p.m.) on his way to make a speech.

It has already been described by Fagan how he had checked with Duncan the day prior to the date of the Tentative Agreement. The Hearing Officer has already found that the County negotiators left the negotiations to talk to the County Executive, returned with a smile, and said we have an agreement. The union was not advised of the negotiators' failure to reach Hogan or Duncan. Fagan when questioned by the Hearing Officer why they did not wait for Hogan or Duncan to confirm the Tentative Agreement since he had concerns about the terms (and since he repeatedly testified that the County Executive never gave him authority to sign for him), responded "we . . . thought we could work it out, as we had in the past, with the County Executive and get his okay . . ." This is inconsistent with Fagan's testimony that when AFSCME became "very insistent" that issues be checked, he did check or "backfill" and did not raise the matter with the union unless the Executive had some problems with it. On February 13, 1980, after a year of negotiating, over 7 months after the contracts had expired, with a strike impending, it is not believable that Fagan and Siegel went to check with Hogan, did not reach him, but came back smiling and led AFSCME into believing that an unpredictable County Executive would certainly approve the package if the union would accept a couple of minor modifications.

Moreover, if an agreement was not previously reached, it is inconceivable that there would have been the flurry of late night calls, with no reference to the terms of the contract being unacceptable. It is equally inconceivable that if the County Executive had not approved the agreement, that promises could be

hearing officer further concluded "from the evidence, that the agreement reached earlier on February 13, 1980, would not have been rejected by the County Executive had the article in *The Washington Star* not appeared that day." He found the County had violated, *inter alia,* § 113 (a) (5) of the Labor Code ("refusing to bargain collectively in good faith ...").

Labor Code, § 114 (c) states that "[i]f upon the preponderance of the testimony taken the Panel shall be of the opinion that any person named in the complaint has engaged in ... an unfair labor practice, then the Panel shall ... issue ... an order requiring that he cease and desist from such unfair labor practices and to take such affirmative action, including reinstatement with or without back pay, as will effectuate the policies of this law." On this phase of the case, the hearing officer stated that "[i]n view of the fact, that it has been ruled herein that the County Executive both directly and indirectly, through his agents, caused an agreement to be approved and where his agents may legally submit the contract to County Council on his behalf, no further discussion of the PERB's powers are needed." The PERB order, directed to "Prince George's County, through its officers, agents, representatives, negotiators, attorneys, successors and assigns" provided in part that they shall:

Take the following affirmative action ...

1. Formally execute and transmit promptly to County Council the collective bargaining agreement ... that was agreed to by the County and AFSCME negotiators on February 13, 1980, and subsequently ratified by the AFSCME membership on February 18, 1980. Such legislation as may be needed to effectuate said collective bargaining agreement shall be

---

made that the sham mediation would produce the agreement already signed or that a statement critical of County Council would result in the same agreement. Therefore, the evidence indicates that the County Executive must have given his negotiators his oral approval of what he understood they agreed to.

timely drafted and submitted to County Council in order to facilitate the implementation of that agreement.[5]

Under Labor Code, § 114 (e) the findings of the Unfair Practices Panel "shall be conclusive and binding," unless a petition for relief is timely filed with the Circuit Court for Prince George's County and "unless said Court finds that the Panel's decision or order was not supported by substantial evidence." Of critical significance to the scope of review here is the absence of any statutory provision conferring a right of appeal from the determination of the Circuit Court for Prince George's County in such an administrative appeal from the Unfair Labor Practice Panel of PERB.

The County appealed the PERB order to the circuit court. The petition in support of appeal included the assertion that the evidence was insufficient to support PERB's conclusion that the County Executive had approved the tentative agreement. In an opinion from the bench, the circuit court found that "there is substantial evidence to support the conclusion[s] reached by the hearing examiner in his March 19, 1980 Order," except as to an award in favor of the union of counsel fees. An appeal by the County was noted to the Court of Special Appeals. Certiorari issued on the union's petition prior to consideration by the intermediate appellate court.

What is the scope of our review? Appellate jurisdiction ordinarily is " 'delimited by statute'." *Estep v. Estep,* 285 Md. 416, 422, 404 A.2d 1040, 1043 (1979) (quoting *Peat & Co. v. Los Angeles Rams,* 284 Md. 86, 90, 394 A.2d 801, 803 (1978); *see* Md. Const. art. IV, §§ 14, 14A. Maryland Code (1974, 1980 Repl. Vol.), § 12-302 (a) of the Courts and Judicial Proceedings Article provides:

Unless a right of appeal is expressly granted by law, § 12-301 [Right to Appeal From Final Judgments of

---

5. There is no contention by the County that the second sentence of the order is beyond PERB's power even if the finding of County Executive approval of the tentative agreement is not reversible. Consequently, we do not consider that aspect.

a Circuit Court] does not permit an appeal from a final judgment of a court entered or made in the exercise of appellate jurisdiction in reviewing the decision of the District Court, an administrative agency or local legislative body.

This Court has "[j]urisdiction to review a case or proceeding pending in ... the Court of Special Appeals in accordance with Subtitle 2" of Title 12 of the Courts Article. § 12-307 (1). Section 12-201 of the Courts Article authorizes this Court to grant certiorari "in any case or proceeding pending in ... the Court of Special Appeals *upon appeal* from a circuit court ...." (emphasis added). The County recognizes that there is no statute which confers a right to appeal the PERB order beyond the circuit court level. Hence, under the circumstances of this case the scope of appellate review by this Court under the writ of certiorari which we issued to the Court of Special Appeals is limited to the extent to which the intermediate appellate court could have reviewed the order of the Circuit Court for Prince George's County which affirmed the PERB order.

Despite the absence of a statute conferring the right to appeal, a limited review by way of appeal may nevertheless be premised upon an exception to § 12-302 (a)'s prohibition. The County invokes that exception. It has long been recognized that if a circuit court acts in the exercise of a special judicial review jurisdiction, from which no right of appeal is conferred, appellate review is available to determine whether the circuit court acted without having lawfully acquired jurisdiction or whether it exceeded the authority conferred upon it. *E.g., Urbana Civic Ass'n v. Urbana Mobile Village, Inc.,* 260 Md. 458, 272 A.2d 628 (1971); *Johnson v. Bd. of Zoning Appeals,* 196 Md. 400, 76 A.2d 736 (1950); *Employment Security Bd. v. Spiker,* 194 Md. 351, 71 A.2d 299 (1950); *Lambros v. Brown,* 184 Md. 350, 41 A.2d 78 (1945); *Stephens v. Mayor and Council of Crisfield,* 122 Md. 190, 89 A. 429 (1914); *Hough v. Kelsey,* 19 Md. 451 (1863); *Abbott v. Administrative Hearing Bd.,* 33 Md. App. 681, 366 A.2d 756 (1976), *cert. denied,* 280 Md. 727 (1977). 2 J. Poe, *Pleading and Practice* § 826, at 798 (5th ed.

1925). The review sanctioned by this exception confers authority to consider

> not whether the trial Court rightly decided but whether it had the right to decide, what it did decide. If it had the right to decide what it did decide then, though its decision be, in point of fact or of law, erroneous it cannot be reviewed, because the statute has conferred no power upon [the appellate court] to sit in review of such a judgment. So the ultimate question is, were the things complained of and decided below, things which the [circuit] Court had jurisdiction to decide. [*N.Y. Mining Co. v. Midland Mining Co.*, 99 Md. 506, 512, 58 A. 217, 220 (1904).]

Thus, this Court has undertaken to review and reverse the judgment of the circuit court in an attempted administrative appeal where no statute authorized an appeal to that court from the decision of an administrative agency, *Urbana Civic Ass'n v. Urbana Mobile Village, Inc., supra; Employment Security Bd. v. Spiker, supra,* and where the circuit court in a de novo appeal from a justice of the peace failed to acquire personal jurisdiction of the defendant because no summons was issued against it. *Smith Premier Typewriter Co. v. Westcott,* 112 Md. 146, 75 A. 1052 (1910). *See also Close v. Southern Md. Agr. Asso.,* 134 Md. 629, 108 A. 209 (1919) (circuit court reversed where statute authorizing it to issue licenses determined to be unconstitutional and void).

In contrast to the cases above mentioned, this Court has often reviewed the merits of a jurisdictional objection but dismissed the appeal or affirmed the lower court, after determining that it had jurisdiction over the subject matter or that it did not exceed the authority conferred upon it by statute. *See, e.g., Johnson v. Bd. of Zoning Appeals, supra; Bd. of Medical Examiners v. Steward,* 203 Md. 574, 102 A.2d 248 (1954); *Montgomery Ward & Co. v. Herrmann,* 190 Md. 405, 58 A.2d 677 (1948); *Lambros v. Brown, supra; Stephens v. Mayor and Council of Crisfield, supra; Wilmer v. Mitchell,* 122 Md. 299, 89 A. 612 (1914); *Josselson v. Sonneborn,* 110

Md. 546, 73 A. 650 (1909); *Rayner v. State,* 52 Md. 368 (1879); *Orme v. Williams,* 47 Md. 552 (1878); *Hough v. Kelsey, supra; Wilmington & Susquehanna R.R. v. Condon,* 8 Gill & J. 443 (1837). The Court of Special Appeals has similarly applied the rule. *Abbott v. Administrative Hearing Bd., supra; American Ambulance & Oxygen Service v. Mayor and City Council of Baltimore,* 31 Md. App. 432, 356 A.2d 580 (1976); *Prince George's County v. Fahey,* 28 Md. App. 312, 345 A.2d 102 (1975).

In its brief as supplemented by oral argument, the County advances three general points why it says jurisdiction was exceeded. All are aimed at the portion of the PERB order directing the County formally to execute the agreement for transmittal to the Council. It is contended PERB exceeded its jurisdiction because (1) there was no agreement to enforce; (2) even if an agreement existed, PERB had no power under the Labor Code to order that it be signed; and (3) absent approval by the County Executive acting "officially," a finding of approval by him violates the Prince George's County Charter by invading the discretion inherently reserved in that office. In addressing these points we shall assume, without deciding, that in an appeal from an order in an unfair labor practice hearing under the Labor Code, if PERB exceeds its jurisdiction, that defect would similarly infect an order of affirmance by the Circuit Court so as to make the latter order subject to reversal on a review limited to the issue of jurisdiction. *Compare Textor v. Balto. & Ohio Ry.,* 107 Md. 221, 68 A. 493 (1908) *and Cumberland Valley Ry. v. Martin,* 100 Md. 165, 59 A. 714 (1905) *and Darrell v. Biscoe,* 94 Md. 684, 51 A. 410 (1902) *with Bd. of Medical Examiners v. Steward,* 203 Md. 574, 102 A.2d 248 (1954).

Underlying the County's position that there was no agreement at all between the employer and the union on February 13, 1980, and therefore nothing to enforce, is the contention that county negotiators had no authority to agree to some or all of the issues embodied in the "tentative agreement," and that final approval authority was reposed solely in the County Executive who rejected the tentative

agreement. The obvious fallacy in this argument is that it ignores the PERB finding that the County Executive approved the tentative agreement. That finding is one which was within the general power of the hearing officer to make. Charter § 908 of Article IX confers a right on county employees to bargain collectively and authorizes a labor code which "shall include . . . remedies for unfair labor practices." The Labor Code has specified certain unfair labor practices (§ 113) and established an administrative procedure for resolution of unfair labor practice charges (§ 114). There is no contention that these sections of the Labor Code are void *per se.* Whether the hearing officer erred because there was a lack of substantial evidence to support the finding of approval by the County Executive was a question which was before the Circuit Court for Prince George's County on the administrative appeal from the PERB order. The circuit court determined the PERB order to have been supported by substantial evidence. It was within the jurisdiction of the circuit court, under Labor Code § 114 (e), to make that determination. Neither the hearing officer nor the circuit court exceeded their jurisdiction and that is the only question before this Court. We have no authority to review whether or not PERB or the circuit court erroneously exercised their power.

The County next argues that "[e]ven if a labor agreement had existed, the Panel was without jurisdiction to enforce it." This argument is predicated almost exclusively on the concept that there is no power in the PERB panel to enforce as an agreement that which is not legally effective, because of a lack of authority of the county negotiators. The argument again ignores the finding, which is final for present purposes, that the County Executive approved the tentative agreement. Within the framework of that finding, we conclude that PERB had jurisdiction to order written preparation of the tentative agreement in formal form and signing of the product by the County, acting, if need be, through the County Executive. Labor Code § 114 (c) empowers an unfair labor practice panel to order an offending party "to take such affirmative action . . ., as will

effectuate the policies of this law." It is clear to us that this power is not limited to matters of reinstatement or back pay. The declaration of policy is found in § 101 of the Labor Code. It is "to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government. These policies are best effectuated by ... (3) *requiring the employer to* negotiate with and *enter into written agreements with exclusive representatives* on matters of wages, hours and other terms and conditions of employment ...." (Emphasis supplied.) In the public employees sector the power of an administrative body to order affirmative action to rectify an unfair labor practice has been applied to direct the formal execution of an agreement. *See, e.g., Medway Teachers Ass'n v. Medway School Committee*, [1977-1980 Transfer Binder] Pub. Empl. Barg. Rep. (CCH) ¶ 41,640 (Maine Labor Rel. Bd. Jan. 10, 1980) (Terms of agreement ordered reinstated after school committee unilaterally altered agreement when reducing it to writing); *East Brunswick Board of Education and East Brunswick Administrative Association*, Docket No. SN-76-19, CO-76-25-29, P.E.R.C. No. 77-6 (N.J. PERC 1976); *Bergenfield Board of Education and Bergenfield Education Association*, N. Co.-16, P.E.R.C. No. 90 (N.J. PERC 1975); *Redmond Education Ass'n v. Redmond School Dist.*, [1977-1980 Transfer Binder] Pub. Empl. Barg. Rep. (CCH) ¶ 40,657 (Oregon Empl. Rel. Bd. Oct. 18, 1978), *aff'd*, 3 Pub. Empl. Barg. Rep. (CCH) ¶ 36,767 (Ore. Ct. App. Oct. 8, 1979). That form of relief has even been ordered where the affirmative action language is not included in the statute. *PERB v. Martin*, 88 L.R.R.M. 2531 (N.Y.S. Ct. 1974). Under § 10 (c) of the National Labor Relations Act, 29 U.S.C. § 160 (c) (1976), the NLRB has power to order one found to have committed an unfair labor practice "to take ... affirmative action ...." While "no body of Federal ... law, applicable wholly or in part to private employment, shall be regarded as binding or controlling precedent" in applying Labor Code § 114 ("Procedure concerning unfair labor practices") (§ 114 (b)), analogy to the decisions under § 10 (c) of the NLRA

reflects that execution of an agreement has been ordered as "affirmative action."

> A business man who entered into negotiations with another for an agreement having numerous provisions, with the reservation that he would not reduce it to writing or sign it, could hardly be thought to have bargained in good faith. This is even more so in the case of an employer who, by his refusal to honor, with his signature, the agreement which he has made with a labor organization, discredits the organization, impairs the bargaining process and tends to frustrate the aim of the statute to secure industrial peace through collective bargaining. *[H.J. Heinz Co. v. National Labor Relations Board,* 311 U.S. 514, 526, 61 S. Ct. 320, 325-26, 85 L. Ed. 309, 318 (1941).]

*See also National Labor Relations Board v. Strong,* 393 U.S. 357, 361, 89 S. Ct. 541, 545, 21 L. Ed. 2d 546, 550 (1969); *National Labor Relations Board v. H. Koch & Sons,* 578 F.2d 1287 (9th Cir. 1978); *National Labor Relations Board v. Huttig Sash and Door Company,* 362 F.2d 217 (4th Cir. 1966).

At oral argument the County emphasized that the County Executive is, under Article IV, § 402 of the county charter, vested with all executive power which is vested in Prince George's County by the constitution and laws of Maryland and by the charter. This power includes "signing or causing to be signed on the County's behalf all ... contracts and other instruments ...." It is contended that the County Executive necessarily has a discretion to reject any agreement until it is "officially" approved by him. It is said that if the Labor Code permits a finding to be made that the County Executive approved the tentative agreement in this case, without his having done so "officially," then the Labor Code, as so interpreted, is invalid under the charter and the hearing officer exceeded his jurisdiction. We shall assume that the County may, in this case, challenge the validity, as applied, of its own ordinance. *See Maryland Classified*

*Employees Ass'n v. Anderson,* 281 Md. 496, 380 A.2d 1032 (1977).

The above-quoted provision of Prince George's County Charter, Article IV, § 402 is quite similar to Baltimore County Charter, Article IV, § 402 (d) 12 which provides that the County Executive shall "sign on the county's behalf all deeds, contracts and other instruments . . ." and which was before this Court in 1962 in *Cohen v. Baltimore County,* 229 Md. 519, 185 A.2d 185. Equally applicable here is our statement in *Cohen* that the provision "does not, however, require the formal execution of a contract between the County and the other contracting party before the contract would be enforceable." *Id.* at 524, 185 A.2d at 188. We there quoted 63 C.J.S. *Municipal Corporations* § 1007 a, to the effect that " '[i]f no formal mode of making a municipal contract is prescribed by charter, statute, or ordinance, then the contract may be made in the method common to all corporations'. . . ."

The Labor Code does not prescribe any particular formality for the tentative agreement which is enforced under the PERB order in the instant case. Section 109 (e) provides:

> Any agreement reached by the negotiators shall be reduced to writing and shall be executed by both parties. Such agreement shall be valid and enforced under its terms when entered into, in accordance with the provisions of this law and County Charter.

The "agreement reached by the negotiators" is the tentative agreement. "Such agreement," referred to in the second sentence, is the agreement reached by the negotiators. Subsequent memorialization, by reduction to writing and signing, is required, particularly for submission of "such written agreement" to the County Council under § 109 (f), but "[s]uch agreement," *i.e.,* "reached by the negotiators," is "valid and enforced under its terms when entered into . . . ." We accept, *arguendo,* the County's position that any

agreement "reached by the negotiators" must be one which the county negotiators were authorized by the County Executive to reach. We do not accept, however, that the authorization from the County Executive must be manifested in any particular mode or form in order for it to be effective or "official." Hence, the finding that the County Executive orally approved the tentative agreement does not convert the exercise by the hearing officer of a power conferred under the Labor Code into a violation of the Charter of Prince George's County, Maryland.

In addition to the foregoing arguments, the County asserts that this Court "is inherently empowered to review and correct the actions of an inferior tribunal which are contrary to law or beyond the scope of its jurisdiction." It cites *Criminal Injuries Compensation Board v. Gould,* 273 Md. 486, 331 A.2d 55 (1975). At oral argument the County speaks of review by this Court under the writ of certiorari. We have explained, *supra,* why review under the writ of certiorari issued by this Court to the Court of Special Appeals is limited to jurisdictional issues. Further, reliance on *Gould* is misplaced. The statute involved in *Gould* made no provision for a claimant to appeal to a circuit court from a determination of the Criminal Injuries Compensation Board, but did permit such an appeal by the Attorney General. A prohibition in the statute against any other judicial review was construed to embrace only review by way of the Administrative Procedures Act. Under those circumstances we applied the rule that "the Legislature cannot divest the courts of the inherent power they possess to review and correct actions by an administrative agency which are arbitrary, illegal, capricious or unreasonable." 273 Md. at 501, 331 A.2d at 65. That principle relates to an application addressed to the original jurisdiction of a circuit court and appellate review is by way of appeal from that exercise of original jurisdiction by the circuit court. Here, special appellate jurisdiction of the Circuit Court for Prince George's County was invoked under the limited administrative appeal provisions of Labor Code, § 114 (e). Indeed, the County's "Petition in Support of

Appeal" referred to subtitle B (of Chapter 1100) of the Maryland Rules of Procedure, relative to appeals from administrative agencies.

While the County has additionally raised a number of arguments, it does not contend that they go to the question of the jurisdiction of PERB or of the circuit court. Those questions are not open for review.

Because we are limited to jurisdictional issues, we do not pass upon the underlying merits, *vel non,* of the County's contentions. But, inasmuch as we have made that limited review which is available here pursuant to the County's appeal, dismissal is not the appropriate mandate. *Abbott v. Administrative Hearing Bd., supra,* 33 Md. App. at 686, 366 A.2d at 759.

> *Judgment of the Circuit Court for Prince George's County affirmed.*
> *Appellant to pay the costs.*