648 A.2d 1091

The **OCEAN CITY BOARD OF SUPERVISORS OF ELECTIONS, et al.**

v.

**Vincent dePaul GISRIEL, Jr.**

**No. 21, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Oct. 28, 1994.

Certiorari Granted March 10, 1995.

138

Guy R. Ayres, III (Ayres, Jenkins, Gordy & Almand, P.A., on the brief), Ocean City, for appellants.

Christopher F. Davis (Philip C. Smith and Hearne & Bailey, P.A., on the brief), Salisbury, for appellee.

Argued before WENNER and HARRELL, JJ., and ELLEN L. HOLLANDER, Judge, Specially Assigned.

HARRELL, Judge.

Appellants, the Ocean City Board of Supervisors of Elections (Board), the Town of Ocean City, and the Mayor and City Council for the Town of Ocean City (City Council), appeal from a judgment of the Circuit Court for Worcester County. That judgment reversed and remanded a decision by the City Council that had affirmed the Board's rejection of a petition to referendum filed by appellee, Vincent dePaul Gisriel, Jr.

### Facts

On 18 January 1993, the City Council, pursuant to the zoning powers conferred upon incorporated municipalities by

Md.Ann.Code, Art. 66B (1988 Replacement Volume & 1993 Supp.), enacted zoning Ordinance 1993–1 as an element of the comprehensive rezoning of the entire City. On 28 January 1993, displeased by various aspects of the new zoning ordinance, appellee prepared and circulated a petition for referendum on certain portions of Ordinance 1993–1. While gathering signatures for the petition, appellee discovered numerous people on the Ocean City voter registration list[1] who he believed had moved away, were listed twice, or were deceased. Before appellee submitted his petition, he had proposed 525 names he believed should be purged from the city's voter registration list.[2] Of the twenty-seven names claimed by appellee to be duplicative, the Board determined twenty-four to be valid. The Board also concluded that appellee's information indicating that 183 other people on the registration list were deceased or relocated was inaccurate. The remaining 315 names were not yet checked by the date appellee filed his petition.

On 16 February 1993, appellee submitted his petition to referendum of Ordinance 1993–1 to the Board to determine whether it had been signed by twenty percent of the qualified

---

1. The Ocean City voter registration list is a combination of two different voter registration lists. The "universal list" contains names of people who register to vote with Worcester County. *See* Md.Code Ann., Art. 33, § 3–2 (1993 Replacement Volume & 1993 Supp.). The "supplemental list" contains names of people who register to vote with Ocean City, but do not register with the County. *See id.* § 3–2(d). While names of voters who have become disqualified may be removed by the Board from the supplemental list, only the County Board of Elections can remove a name from the universal list. Thus in order to maintain accurate voter registration lists, the Board must review the universal list and submit names for removal to the County Board of Elections. Both of these lists are combined by the Board to determine the total number of qualified voters in Ocean City, and is referred to as the Ocean City voter registration list. These lists are discussed separately *infra.*

2. Because these letters are not in the record, we are unable to ascertain the names contained therein; nor were we able to determine whether the challenged names were on the universal or supplemental voter registration list.

voters as required by § C–411 of the Ocean City charter.[3] The Board found that the total number of petition signers was 1013, of which four were duplicate signatures, sixty-one were non-registered signers, and one was rejected for other cause, reducing the total number of valid signatures to 947. The Board then used the Ocean City voter registration list, as it existed on 16 February 1993, to determine the total number of qualified voters to be 4903.[4] Therefore, the Board concluded, appellee's total number of valid signatures represented only nineteen percent of the qualified voters of the Town of Ocean City, or thirty-four signatures short of the requisite twenty percent. The City Council accepted the Board's findings and denied appellee's petition to referendum.

The next day, appellee appealed the Board's findings to the City Council pursuant to § C–505 of the Ocean City charter.[5] As grounds for his appeal, appellee argued: 1) the Board presented an inaccurate report regarding the certification status of his petition; 2) the Board failed to maintain "an accurate, up-to-date list of eligible and qualified voters;" and, 3) the Board failed to strike from the voter registration list those names that appellee identified as deceased, moved away, or duplicative. Appellee also appealed the City Council's

3.  Section C–411 provides in pertinent part:
    Provided that the petition is submitted within said three-day period and is approved as aforesaid, the petitioners shall have twenty (20) days from the date of approval to obtain the signatures of twenty percent (20%) of the qualified voters of the town upon the petition.

4.  The Board explained that this number reflected the three names submitted by appellee that were purged as duplicative, and the names of five people who registered prior to 16 February 1993, but were added after that date.

5.  Section C–505 provides:
    If any person shall feel aggrieved by the action of the board of supervisors of elections in refusing to register or in striking off the name of any person or by any other action, such person may appeal to the Council. Any decision or action of the Council upon such appeals may be appealed to the Circuit Court for the county within thirty (30) days of the decision or action of the Council.

acceptance of the Board's findings and its subsequent denial of his petition.

The City Council held a hearing on 15 March 1993. Appellee's first exhibit was § C–411 of the Ocean City charter. Appellee argued that that section requires a petition to referendum contain signatures of not less that twenty percent of the *qualified* voters of the Town of Ocean City. Appellee's second exhibit was § C–504 of the Ocean City charter, which states that it is the Board's duty to strike from the registration list persons known to "be dead or who have become disqualified." Appellee then emphasized that neither section of the charter referred to a "qualified" voter as a "registered" voter. Therefore, appellee argued, the Board must determine the total number of "qualified" voters, not "registered" voters, before deciding whether his petition to referendum contained the proper number of signatures.

In support of this argument, appellee attempted to prove to the City Council that the Ocean City voter registration list contained names of unqualified but registered voters.[6] Appellee supplied a list of seventy-seven names, with accompanying documentation, that were removed from the County universal registration list but were not removed from the Ocean City voter registration list. Appellee also offered evidence of nineteen names that were included on the Ocean City voter registration list, but were on neither the universal list nor the supplemental list. In addition, appellee presented evidence of fifteen people whose names were on the Ocean City voter registration list, but who were living outside the Town of Ocean City. Appellee also introduced evidence of twenty-five people listed on the Ocean City voter registration list that are deceased. And finally, appellee indicated that there were eight names on the Ocean City list that were duplicative. Therefore, argued appellee, the total number of qualified

6. First, appellee offered evidence indicating that there were thirteen signatures on his petition that had been disqualified by the Board but were, in fact, qualified signatures, thereby increasing the total number of petition signers to 960.

voters in Ocean City was actually 4767.[7]  Pursuant to § C–411, appellee concluded that twenty percent of 4767 is 954, and that his petition contained 960 signatures, including the thirteen he contended were erroneously disqualified by the Board. Therefore, appellee stated that "any reasonable person upon review of this would agree that we more than met the provisions of the charter for a successful petition."[8]

In response, Mary Adeline Bradford, chairperson of the Ocean City Board of Supervisors of Elections, explained that the Board has standard procedures for purging the Ocean City voter registration list, and pursuant to those procedures the Board determined the number of qualified voters in Ocean City to be 4903 on 16 February 1993, the date appellee's petition was submitted.  Ms. Bradford also testified that the Board meets periodically to maintain an accurate and up-to-date voter registration list for the Town of Ocean City.[9]  She explained that the process of culling the voter registration list is burdensome and must be undertaken with caution, as "you're dealing with someone's constitutional right to vote for which wars have been fought."  Finally, Ms. Bradford discussed the importance and practicality of "freezing" the voter registration list as of a certain date.

Appellee agreed that the registration list should have been frozen on 16 February 1993, but that the Board in fact added

---

7.  Appellee concedes that the documentation offered in support of these figures was not obtained until after 16 February 1993, the date the petition was submitted.

8.  Appellee, although acknowledging that he had obtained the required number of signatures by his calculations, offered further evidence that 128 people on the supplemental list had not voted in the last two elections and thereby should be purged pursuant to § C–504 of the Ocean City charter.  In addition, appellee provided thirty names of people who no longer resided in the Town of Ocean City, but still were listed on the supplemental list.  Therefore, appellee contended, the total number of qualified voters in Ocean City was 4609, and twenty percent of that number is 922.

9.  The Board's last meeting to update the registration list prior to the submission of appellee's petition was October 20, 1992.

five names to the list after that date. Therefore, appellee reasoned:

> If you can add names that increase the total, then the same courtesy and fair play ought to work in reverse. You should be deleting names that are shown to be ineligible. The rolls were not frozen on ... 2–16. You in fact added names.

Ms. Bradford replied that the five people added to the Ocean City voter registration list had registered in Snow Hill prior to 16 February 1993, and that the paper work was delayed in getting to Ocean City. Therefore, she explained, "had everything been under one roof, we would have had those names anyhow."

In response to a question from one of the councilmen concerning whether one can go back and change the registration list after it has been frozen, City Solicitor Guy R. Ayres III, representing the Board, explained:

> Well, it seems to me that it's in everybody's benefit to have a, a given date so that number one, the petition drivers know the percent—know the number of petitions they have to get. If it's, if it's left open, then the organizers of the petition drive would never know how many signatures they had to get. So there has to be a date. Whether it be the day that the ordinance was signed into law or whether it be February the 16th, I'm not sure there's—maybe that's six, one-half dozen or the other; but at least you have a finite date that they knew they had to have X number of signatures.
>
> It seems to me that what's happened is they didn't get that number of signatures. So now they're coming back and trying to be some type of super-Board of Elections and say, Board, you didn't do your job right. We don't think these people should be qualified to vote; therefore, they should be, they should be deleted.

At the conclusion of the hearing, appellee requested that the City Council remand the matter to the Board for a determination, based upon the documents and testimony offered, of

whether the number of signatures on appellee's petition represented twenty percent of the qualified voters as of 16 February 1993. Instead, the City Council voted six to one to affirm the Board's decision.

Appellee filed a timely appeal of the City Council's decision to the Circuit Court for Worcester County, pursuant to § C–505 [10] of the Ocean City charter. Appellee argued that the Board did not properly purge the names of those people who were not qualified to vote as of 16 February 1993 from the Ocean City voter registration list. Appellee explained that the term "qualified" voter, as used in § C–411 of the charter, does not mean "registered" voter as interpreted by the Board and City Council. In reply, appellants questioned appellee's ability even to petition a comprehensive rezoning to referendum and, assuming such a petition was proper, the Board had no obligation to cull the voter registration list after the petition was submitted.

A hearing was held in the circuit court on 20 October 1993. In an Opinion and Order of Court, issued on 12 November 1993, the judge, as a threshold issue, decided that comprehensive rezoning is part of the zoning power granted to incorporated municipalities under Md.Ann.Code, Art. 23A (1990 Replacement Volume & 1993 Supp.), and therefore is expressly subject to referendum. On the issue of "qualified" versus "registered" voters, the judge referred to § C–403 and § C–504 of the Ocean City charter and stated:

> The Court must also agree with [appellee] on the issue of the Petition. Clearly, if a voter is "registered", he or she may still not be qualified to vote, while every qualified voter must, by definition, be registered. The referendum ordinance clearly requires a petition to referendum to be signed by twenty percent of the "qualified", not the "registered", voters. The Court finds Ocean City's refusal to strike unqualified but registered voters from the voter roll as of

---

**10.** *See supra* note 5.

[16 February 1993] to be erroneous as a matter of law, as well as arbitrary and capricious.

Accordingly, he remanded the case to the City Council for further remand to the Board for further proceedings consistent with his opinion. Appellants noted a timely appeal to this Court.

## Issues

I.   Must voter registration lists be purged if a referendum petitioner challenges voters on the list collaterally to challenging denial of the petition?

II.  May misspelled and inaccurate or other unregistered signatures on a referendum petition be rejected?

## Discussion

### Jurisdiction

■ As a threshold determination, we raised at oral argument the issue, *sua sponte,* of whether this Court has jurisdiction in this matter. This case was styled as an appeal from an administrative agency to the circuit court pursuant to § C–505 [11] of the Ocean City charter. That section contemplates only an appeal from the City Council to the circuit court. While the general jurisdiction statute, Md.Code Ann., Cts. & Jud.Proc. § 12–301, provides for an appeal to this Court of a final judgment entered in a civil case by a circuit court in the exercise of its *original* jurisdiction, § 12–302(a) expressly states that there is no appeal from a final judgment of a court made in the exercise of *appellate* jurisdiction in reviewing the decision of an administrative agency. We conclude, however, that the circuit court exercised original jurisdiction in reviewing the decision of the City Council, and that this case is properly before us.

Section 12–301 provides in pertinent part:

---

11.  *See supra* note 5.

Except as provided in § 12–302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law.

Section 12–302(a), however, states that "[u]nless a right to appeal is expressly granted by law, § 12–301 does not permit an appeal from a final judgment of a court entered or made in the exercise of appellate jurisdiction in reviewing the decision of ... an administrative agency." The issue, therefore, is whether the circuit court, in the case *sub judice*, exercised original or appellate jurisdiction when it reviewed the City Council's decision to affirm the Board's denial of appellee's petition.

In *Shell Oil Co. v. Supervisor of Assessments*, 276 Md. 36, 43, 343 A.2d 521 (1975) (emphasis in original), the court held that "the exercise of appellate jurisdiction requires a prior action by some *judicial* authority, or the prior exercise of *judicial* power." Moreover, Maryland courts have consistently held that, under Art. IV, § 1 of the Maryland Constitution, such judicial power may not be exercised by entities other than those courts enumerated in the Constitution. *Shell*, 276 Md. at 45; *see also Solvuca v. Ryan & Reilly Co.*, 131 Md. 265, 282, 101 A. 710 (1917). As explained in *Dal Maso v. County Comm'rs.*, 182 Md. 200, 205, 34 A.2d 464 (1943) (citations omitted):

In this State, all judicial authority is only such as provided for by Article 4 of the Maryland Constitution, and it has been decided that only judicial functions can be exercised which find their authority in that Article, and that no court not coming within its provisions can be established in this State. This forbids any power in the Legislature to clothe administrative boards with any judicial authority. There may be states in which it can be done, but Maryland is not one of them.

*See also County Council v. Investors Funding,* 270 Md. 403, 426–36, 312 A.2d 225 (1973); *State Ins. Comm'r v. National Bureau of Casualty Underwriters,* 248 Md. 292, 298–300, 236 A.2d 282 (1967); *Maryland Comm. for Fair Representation v. Tawes,* 228 Md. 412, 425–26, 180 A.2d 656 (1962); *Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73 (1945).

Maryland courts, however, have upheld the delegation to administrative agencies of certain "quasi-judicial" functions. Indeed, the *Shell* Court acknowledged that "the problems of modern life have necessitated an ever increasing delegation of authority to administrative bodies, and that 'the separation of powers concept may constitutionally encompass a sensible degree of elasticity.'" *Shell,* 276 Md. at 47, 343 A.2d 521 (quoting *Linchester,* 274 Md. at 220, 334 A.2d 514). But, the Court concluded, "any attempt to authorize an administrative agency to perform what is deemed a purely *judicial* function or power, would violate the separation of powers principle." *Id.* (emphasis in original). Consequently, the decision of an administrative agency is the result of the discharge of its executive duties, not the result of the exercise of judicial power. *See Solvuca,* 131 Md. at 282, 101 A. 710; *see e.g., Department of Natural Resources v. Linchester,* 274 Md. 211, 218–27, 334 A.2d 514 (1975); *Cromwell v. Jackson,* 188 Md. 8, 12–13, 52 A.2d 79 (1947). Therefore, as the *Shell* Court held, "the review of the decision of an administrative agency [by a court] is an exercise of original jurisdiction and not of appellate jurisdiction." *Shell,* 276 Md. at 47, 343 A.2d 521.

The inquiry central to our jurisdictional analysis, therefore, is whether the Ocean City Council, sitting as an appeals board pursuant to § C–505 of the charter, is an administrative agency, thereby vesting original jurisdiction in the circuit court. Maryland Rule 7–201(b) broadly defines "administrative agency" as "any agency, board, department, district, commission, authority, commissioner, official, the Maryland Tax Court, or other unit of the State or of a political subdivision of the State." Indeed, the Court of Appeals has held that a County Council, while sitting in an appellate capacity, was an

administrative agency. In *County Council v. Carl M. Freeman Assocs.*, 281 Md. 70, 376 A.2d 860 (1977), the Court, interpreting former Md.Rule B1(b),[12] ruled that the Prince George's County Council, sitting as the District Council in a zoning matter, was an administrative agency under the broad definition set forth in Rule B1(b). *Id.* at 74, 376 A.2d 860. Pursuant to the similarly broad language used in Rule 7–201(b), adopted from former Rule B1(b), the Ocean City Council, acting as a unit of a political subdivision of the State government and sitting as an appeals board pursuant to the Ocean City charter, is also an administrative agency. Therefore, as explained in *Shell, supra,* the circuit court's review of the City Council's decision was an exercise of original jurisdiction. *See Shell,* 276 Md. at 43, 343 A.2d 521. Applying Md.Code Ann., Cts. & Jud.Proc. § 12–301, which provides for an appeal to the Court of Special Appeals from "a final judgment entered by a court in the exercise of original ... jurisdiction," we hold that this matter is properly before this Court.

## I.

### *Purging the Voter Registration List*

Appellants argue that the circuit court's decision, which found a distinction between "qualified" voters and "registered" voters, "requires formal purging of registered voter lists whenever (i) a proponent of a referendum disputes the denial of a petition on the basis of insufficient support, or (ii) anyone

---

12. According to the Committee Notes, Md.Rule 7–201(b) was derived from former Md.Rule B1(b). Rule B1(b) stated:

The term "administrative agency," as used in this Subtitle, shall mean any board, department, commission, authority, commissioner or other officer of the State or of a county or local government, whether appointed or elected, whether legislative, administrative, executive, ministerial or quasi-judicial, whose action or decision is specifically subject to court review, except by way of mandamus, by any provision now or hereafter set forth in any general or local statute, ordinance or regulation now or hereafter in effect; but shall not mean any court created by Article IV of the Constitution of Maryland.

who opposes a referendum desires to challenge the sufficiency of support for a petition." Such a result, contend appellants, "is contrary to the longstanding procedure for determining whether a referendum petition has the degree of support required to warrant a plebiscite ... and violates the established principle that the registered voter lists, as they exist on a particular date, are in the absence of fraud, conclusive of the persons who are qualified to vote."

Specifically, appellants contend that the registration list, as it appears on the day the petition is submitted, is conclusive of the total number of qualified voters, as that term is used in § C–411 of the Ocean City charter. Appellee, on the other hand, argues that the number of qualified voters must be determined by an independent evaluation of each registered voter's qualifications on the day the petition is submitted. Appellee insists that it is the responsibility of the Board, pursuant to § C–504 of the Ocean City charter, to determine whether each registered voter is, in fact, qualified to vote as of the date the petition is submitted. Thus, appellee suggests that a petitioner may submit challenges to the voter registration list at anytime after the petition is submitted, so long as such challenges indicate that the challenged voter was not qualified to vote as of the date the petition was submitted.

While we agree with the circuit court judge, in theory, that a registered voter is not the same as a qualified voter as those terms are used in the Ocean City charter, we hold that the registration list, as of the day the referendum petition is submitted, is conclusive proof of the number of qualified voters in the Town of Ocean City, provided two conditions are satisfied: 1) there is no evidence of fraud or misconduct by the election officials in maintaining the list; and 2) there are statutory provisions available to challenge the registration list, but those provisions have not been utilized.

### Qualified vs. Registered

The circuit court judge, in his Opinion and Order of 12 November 1993, found that there is an analytical difference

between "registered" voter and "qualified" voter, as those terms are defined and used in the Ocean City charter. The Order directed the Board to "cull its voter roll of unqualified but registered voters before it can determine the percentage of voters who signed [appellee's] petition," and "the date the Town must use to purge its voters [sic] roll is February 16, 1993." The practical effect of this decision, however, is that it allows or sanctions a petitioner, such as appellee in fact did here, to challenge the voter registration list at anytime after the referendum petition is submitted, *ad infinitum*, so long as the challenges submitted recite a factual premise that the challenged voter was not qualified to vote as of the date the petition was submitted. Notwithstanding the administrative nightmare this "rolling barrage" scenario would present for the Board, a petitioner also would be disadvantaged as he or she would be unable to ascertain prior to or during the petition signature drive, with any degree of certainty, the number of signatures needed to satisfy the twenty-percent requirement of § C–411. Moreover, while the Board struggles with this potential "rolling barrage" of challenges, the effectiveness of the petitioned law is suspended indefinitely. Therefore, while we appreciate the trial judge's analytical distinction between a "qualified" voter and a "registered" voter, the pragmatics of administering and maintaining a voter registration list mandate a more practical approach.

Section C–403.A of the charter sets out the qualifications of a voter in Ocean City. It provides:

The qualifications of voters in Town elections of Ocean City shall be as follows: A voter, whether a man or a woman, must be:

(1) A citizen of the United States.

(2) At least eighteen (18) years of age.

(3) Registered in accordance with the provisions of this Charter.

(4) One who, for thirty (30) days next preceding the election, has been and is, at the time of the election

domiciled within the corporate limits of the Town of Ocean City.

Section C–504 of the charter states the rules for voter registration. It provides in pertinent part:

Registration shall be permanent, and no person shall be entitled to vote in town elections unless he is registered. It shall be the duty of the Board of Supervisors of Elections to keep the registration list up-to-date by striking from the list persons known to be dead or who have become disqualified. If any person has not voted in two (2) consecutive general municipal elections, it shall be the duty of the Board of Supervisors of Elections to strike his or her name from the list of eligible voters. The Mayor and City Council of Ocean City are hereby authorized and directed, by ordinance, to adopt and enforce any provisions necessary to establish and maintain a system of permanent registration and to provide for a registration when necessary not inconsistent with the provisions of the charter.

Section C–403.A states that to be a qualified voter in the Town of Ocean City, a person must be, among other things, registered to vote. On the other hand, § .C–504 states that only a qualified voter can be registered. Such draftsmanship by the Ocean City Council presents a quandary of circular logic—to be qualified to vote, one must be registered, while to be registered, one must be qualified to vote. In order to understand more fully the meaning of these terms, § C–403.A and § C–504 must be read *in pari materia.*

The basic canons of statutory construction were aptly summarized by the late Judge Orth in *Wheeler v. State,* 281 Md. 593, 596–97, 380 A.2d 1052 (1977) (citations omitted):

The cardinal rule of statutory construction is to ascertain and carry out the real legislative intention. A statute should be construed according to the ordinary and natural import of the language used without resorting to subtle or forced interpretations for the purpose of limiting or extending its operation. That is, we must confine ourselves to the statute as written, and may not attempt, under guise of

construction, to supply omissions or remedy possible defects in the statute. Thus, if there is no ambiguity or obscurity in the language of the statute, there is usually no need to look elsewhere to ascertain the intent of the Legislature. As we said in *Purifoy v. Merc.–Safe Dep. & Trust*, 273 Md. 58, 66, 327 A.2d 483 (1974), "where statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, courts are not at liberty to disregard the natural import of words with a view toward making the statute express an intention which is different from its plain meaning." All parts of a statute are to be read together to find the intention as to any one part, and all parts are to be reconciled and harmonized if possible.

Reading § C–403.A and § C–504 together solves this semantical quagmire. Section C–403.A explains that being registered to vote is only one of the requirements necessary to become qualified to vote in Ocean City. On the other hand, being qualified to vote is the only requirement necessary to become registered to vote.[13] It follows, therefore, that a registered voter may, in fact, not be qualified to vote, while a qualified voter must, pursuant to § C–403.A, be registered. A clear example is a person who met all of the requirements set forth in § C–403.A when he or she registered to vote, but subsequently is no longer domiciled within the corporate limits of the Town of Ocean City. Until that person is struck from the registration list pursuant to § C–504, he or she is registered to vote, but not qualified to vote.

Support for our conclusion is found in *Board of Supervisors v. Smith*, 111 U.S. 556, 4 S.Ct. 539, 28 L.Ed. 517 (1884). In that case, a provision of the Mississippi Constitution provided that the assent of two-thirds of the qualified voters of the county was required to pass upon a proposed issue of municipal bonds. *Id.* at 557, 4 S.Ct. at 539–40. The United States Supreme Court was asked to determine whether "qualified"

---

**13.** Section C–504 also provides that a requirement for *continued* registration is that a person must have voted in two consecutive general municipal elections.

voters meant those voters actually present and voting as determined by the official election return, or those voters qualified and entitled to vote as indicated by the voter registration list. In holding that a "qualified" voter is not the same as a "registered" voter, the Court explained that "although [the Mississippi Constitution] does not recognize any voters as qualified, except such as are registered, [it] does not make all persons, registered as such, qualified." *Id.* at 564, 4 S.Ct. at 543. Furthermore, the Court stated:

And yet, if it is to be construed, in the clause in question, as referring to the registration as conclusive of the number of qualified voters, then no proof is competent to purge the list of those who never were qualified or have died, removed or become otherwise disqualified, thus obliterating the distinction between registered and qualified voters....

*Id.* at 564–65, 4 S.Ct. at 543.

The reasoning of *Smith* is persuasive in our analysis of the Ocean City charter provisions. The legislative intent of § C–504 was clearly to provide a mechanism to strike registered voters who become disqualified. To equate the two terms, as explained in *Smith,* would "obliterat[e] the distinction between registered and qualified voters." *Id.* at 565, 4 S.Ct. at 543. The language of the Ocean City charter presents a similar predicament, and the case law supports a similar conclusion— a "qualified" voter is not synonymous with a "registered" voter.

This conclusion, however, is not as dispositive of the issue in this case as the trial judge thought. While it is true that, in theory, one can be a registered voter and not be qualified to vote, it is imperative that both a legal and a practical mechanism be determined for ascertaining the total number of *qualified voters* with regard to a referendum petition pursuant to § C–411 of the Ocean City charter. Section C–411 provides, in pertinent part:

Following approval of any ordinance by the Mayor or passage of any ordinance over the Mayor's veto, the petitioners shall have three (3) business days to prepare the

)

petition and present the same to the city solicitor for approval. The city solicitor shall have five (5) business days to approve said petition. If the city solicitor fails to act upon the petition within said five (5) days, it shall be considered approved. Provided that the petition is submitted within said three-day period and is approved as aforesaid, the petitioners shall have twenty (20) days from the date of approval to obtain signatures of twenty percent (20%) of the qualified voters of the town upon the petition. If the petitioners take more than three (3) days to submit a petition, which is approved as aforesaid, then, in that event, the twenty-day period to obtain signatures shall be reduced by the number of days in excess of three (3) that it took to submit the approved petition. If an approved petition is filed within the prescribed time period, with the Clerk–Treasurer containing the signatures of not less than twenty percentum (20%) of the qualified voters of the town and requesting that the ordinance, or any part thereof, be submitted to a vote of the qualified voters of the town for their approval or disapproval, the Council shall have the ordinance, or the part thereof requested for referendum, submitted to a vote of the qualified voters of the town at the next regular town election or, in the Council's discretion, at a special election occurring before the next regular election.

In order to petition a particular ordinance to referendum in Ocean City, a petitioner must, among other requirements, obtain signatures of twenty percent of the *qualified voters* of the town. Both appellants and appellee appear to agree, as did the circuit court judge, that the date that must be used to determine the number of qualified voters in Ocean City is the date of the submission of the petition—16 February 1993. The parties disagree, however, as to whether the voter registration list, on the day of the submission of the referendum petition, is conclusive of the number of qualified voters in Ocean City. While we have decided, in theory, that a registered voter is not the same as a qualified voter, for practical purposes, we hold that the registration list, on the day the

referendum petition is submitted, is conclusive proof of the total number of qualified voters in Ocean City.

■ Maryland case law is clear that "when no fraud or misconduct is charged or imputed to the election officials in registering the voter or in retaining his name, the official registration books become, on the day of the election, the list of the only qualified voters of the municipality." *Moore v. Bay*, 149 Md. 286, 293, 131 A. 459 (1925). *See also DuBois v. City of College Park*, 280 Md. 525, 375 A.2d 1098 (1977), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 993 (1983).

In *Lee v. Secretary of State & Mahoney*, 251 Md. 134, 246 A.2d 562 (1968), appellee, Mr. Mahoney, a registered Democrat, decided to run for the United States Senate as an independent candidate. Therefore, he asked the Board of Supervisors of Elections of Baltimore County to reopen the registration books so that he could change his party affiliation. As the books had already been officially closed, appellant challenged the board's actions and Mahoney's subsequent registration as an independent candidate. The Court denied appellant's challenge, holding:

> One who asserts that there is listed on the registration lists something that should not be or that there is not listed something that should be must seek correction by way of § 3–16, the special statutory procedure set up by the legislature, if that way is available to him. No rule is better established than that a claimant must exhaust the statutory remedy the legislature has provided for the wrong of which he complains.

*Id.* at 139, 246 A.2d 562. The Court explained that Md.Code Ann., Art. 33, § 3–16 provided the mechanics for correcting registration lists and because these special statutory remedies were available to appellant and "would have been effective in securing the result he sought ... he was confined to those remedies and, not having made timely use of them, could not later invoke the ordinary jurisdiction of the courts to accomplish the same results." *Id.* at 142, 246 A.2d 562.

Similarly, in *DuBois v. City of College Park*, 280 Md. 525, 375 A.2d 1098 (1976), *cert. denied*, 459 U.S. 1146, 103 S.Ct.

787, 74 L.Ed.2d 993 (1983), three students in College Park sought to challenge the councilmanic districts of that City as unconstitutionally apportioned. The City argued that the students lacked standing to contest the districts because, although they were registered voters, they were not qualified to vote, as they did not meet the residency requirements set forth in the town charter. The Court held that "[t]he registration lists, in the absence of allegations of fraud on the part of election officials, are conclusive evidence of the qualifications of voters, and the qualifications of voters may not be challenged in collateral proceedings." *Id.* at 529, 375 A.2d 1098 (citing *Lee v. Secretary of State & Mahoney*, 251 Md. 134, 246 A.2d 562 (1968); *Moore v. Bay*, 149 Md. 286, 131 A. 459 (1925)). The Court focused on the special statutory remedies available to the City to challenge the registration lists, and explained that "where a statutory remedy is available to challenge qualifications of voters on the registration lists [i.e., Art. 33, § 3–16], that statutory remedy is the exclusive method for challenging the qualifications of registered voters." *Id.* at 533, 375 A.2d 1098. Therefore, the Court concluded:

"[I]f it is believed that the [appellants] are not qualified voters and should be removed from the voter registration lists, the procedures set forth in the election laws should be followed. The city cannot, by merely moving to dismiss for lack of standing in this proceeding, contest the fact that those registered according to the city charter are not qualified voters."

*Id.* at 534, 375 A.2d 1098.

These two cases stand indisputably for the proposition that the voter registration lists are presumed to be the list of all qualified voters at any given point in time, so long as there are appropriate statutory remedies available to purge the lists of disqualified voters. Notwithstanding the general principle that Article 33 does not apply to municipal elections, *Hanrahan v. Alterman*, 41 Md.App. 71, 78, 396 A.2d 272 (this Court held that the definition of election, as set forth in Art. 33, § 1–1(a)(6), specifically excludes municipal elections), *cert. denied,*

284 Md. 744 (1979), we hold that § 3–16 was similarly available to appellee in the instant case and is the statutory remedy for challenging a municipality's voter registration list.

The Court of Appeals took a similar approach in *DuBois v. City of College Park,* 280 Md. 525, 375 A.2d 1098 (1977), *cert. denied,* 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 993 (1983). In that case, the Court held that the statutory remedies for challenging the voter registration list available to the City of College Park, a municipality, were those enumerated in Article 33 of the Election Code. The Court did not preclude the application of Article 33 merely because a municipality was involved. Instead, the Court apparently interpreted § 1–1(a)(6) to prohibit the application of Article 33 to actual municipal "elections." The case *sub judice,* however, does not involve a municipal election, but rather challenges to and correction of the voter registration list. We thus interpret § 3–16 to be directly applicable to the Ocean City voter registration list.[14]

Therefore, § 3–16 of the Election Code was available to appellee in the instant case, and was the exclusive mechanism by which he could challenge the Ocean City voter registration list. Appellee, however, chose not to employ these procedures, and, therefore, is precluded from subsequently challenging the registration list by any other method.

As discussed *supra,* the Ocean City voter registration list is comprised of two lists, a universal list and a supplemental list. The universal list contains names of those people, though presumably residing in Ocean City, who register to vote with Worcester County for State, county, and municipal elections pursuant to Md.Code Ann., Art. 33, § 3–2 (1993 Replacement Volume & 1993 Supp.). The supplemental list contains names of those people, also presumably residing in Ocean City, who register to vote with Ocean City only for Ocean City elections pursuant to § 3–1(b). Because the universal list is controlled

----

14. It is clear, however, that subsection (b)(2), which provides that a challenge may be made at anytime except 45 days prior to "any election," does not include any municipal election.

by the County and the supplemental list is controlled by the municipality, we shall consider each list in turn.

## The Universal Registration List

Pursuant to Md.Code Ann., Art. 33, § 3–2 (1993 Replacement Volume), each incorporated municipality, not otherwise exempted,[15] must implement universal registration not less than six months prior to its municipal election. *Id.* § 3–2(d)(3). Ocean City has adopted universal registration and maintains a universal voter registration list in accordance with the rules and regulations set forth in Article 33. The Election Code also has provided mechanics for correcting the universal registration list. Section 3–16 states:

(b) *Who may file challenge or application for correction of list; when and where filed.*—(1) Any qualified voter may file with the board or with the board of registry:

(i) An objection to the registration of any person the voter has reason to believe is not eligible to vote; or

(ii) An application for the addition of any person whose name has been erroneously dropped from the registration list of any precinct.

(2) The application or challenge may be made at the office of the board at anytime except during the 45 days prior to any election.

(3) An application or challenge shall be made on a form approved by the State Administrative Board of Election Laws and provided by the board for that purpose. The voter shall state thereon, under oath and of the voter's own personal knowledge, the legal basis for the application or challenge.

---

**15.** Section 3–2(d)(1) provides:

This subsection does not apply to a municipal corporation that: (i) Does not require voter registration for its municipal elections; (ii) Prior to the enactment of this subsection, has used the voter registration list supplied by the board as qualification for voting in municipal elections and continues to do so; or (iii) Provides for the board to conduct municipal elections as provided in § 2–9(a) of this article.

Ocean City is not exempted by this subsection.

Section 3–16(b)(2) provides when the challenge is to be made—anytime except forty-five days prior to any election.[16] Section 3–16(b)(3) provides how the challenge is to be made—on an approved form and under oath of the challenger, who must state his grounds of challenge. Section 3–16(c) directs that notice must be given to the challenged voter, and § 3–16(d)(2) states that the challenger must appear at a subsequent hearing or be subject to certain penalties. An appeal from the action of the board to the circuit court, with a subsequent appeal to the Court of Special Appeals, is provided by § 3–21. All of these provisions directly apply to the universal voter registration list. This challenge mechanism is specifically available to ensure the accuracy of the voter registration list, and is the only statutory procedure by which a voter may challenge the list.

These remedies, available to appellee prior to the submission of his referendum petition, are nearly identical to those set forth in *Lee, supra.* Appellee was therefore confined to these remedies in making his challenges to the universal voter registration list. Appellee, however, made absolutely no attempt to employ the procedures set forth in § 3–16 *et seq.* Appellee's challenges were not submitted on a form approved by the State Administrative Board of Election Laws as required by § 3–16(b)(3), but instead were a series of letters submitted to the Ocean City Board of Supervisors of Elections. Moreover, appellee never stated under oath the legal basis for his challenge as required by § 3–16(b)(3). Because the special statutory remedies of §§ 3–16 and 3–21 were available to appellee and would have been effective in securing the result he sought, i.e., reducing the number of qualified voters in Ocean City against which his referendum petition would be measured, we hold that he was confined to those remedies and, not having made timely use of them, could not later, through a series of letters to the Board, accomplish the same results. *See Lee,* 251 Md. at 142, 246 A.2d 562; *DuBois,*

---

**16.** *See supra* note 15.

280 Md. at 534, 375 A.2d 1098. Therefore, those registered voters listed on the universal voter registration list, and incorporated into the Ocean City voter registration list, are presumed qualified as of 16 February 1993, the day appellee submitted his referendum petition.

Collateral support for our application of § 3–16 to a referendum petition is also found in *Shapiro v. Regional Bd. of Sch. Trustees,* 116 Ill.App.3d 397, 71 Ill.Dec. 915, 451 N.E.2d 1282 (1983). In that case, plaintiffs filed a petition with the school board seeking detachment of certain described territory from District No. 65. The Illinois School Code, Ill.Rev.Stat. ch. 122, para. 7–1 (1979), required that any petition for detachment contain signatures of at least two-thirds of the registered voters living in the detachment area. Plaintiffs' petition contained 1928 signatures, of which 1667 were registered voters. As there were only 2268 registered voters residing in the detachment area,[17] plaintiffs argued that their petition met the requirement set forth in paragraph 7–1. Defendants objected to the sufficiency of the petition, claiming that the number of registered voters in the detachment area was actually 2858, the number listed in the official Cook County precinct election binders on the date the petition was filed. Therefore, argued defendants, plaintiffs needed 1928 signatures for a valid petition (erroneous mathematics aside). The defendants also contended that the form of the petition was not in accordance with the Election Code provisions governing the form and content of various petitions.

The Regional Board of School Trustees of Cook County dismissed the petition and stated four bases for its ruling: 1) because the School Code was silent as to the method of determining the number of registered voters in the detach-

---

**17.** Plaintiffs' figure was arrived at in the following manner: working from an April 1979 official precinct list showing 2867 registered voters in the detachment area, circulators visited or called each address listed thereon and asked about each registered voter shown as residing at that address; if informed that the person in question was dead or had moved, the circulators crossed the name of the list; 597 names were removed by this process.

ment area, the applicable standards were in the State Election Code; 2) the petition was not in the form prescribed by the Election Code; 3) the survey conducted by plaintiffs was not the proper method of challenging and removing names from the registration list; 4) even if the Election Code did not apply, the Board should adopt its own standards. The trial court affirmed the Board's decision.

On appeal, the Illinois Appellate Court held that the procedures employed by plaintiffs in determining the number of registered voters in the detachment area, *see supra* note 18, were ineffectual. The court explained that "[i]f plaintiffs wish to challenge the official registry, they must do so in a manner provided by statute, i.e., section 4–12 [18] of the Election Code." *Id.* 71 Ill.Dec. at 922, 451 N.E.2d at 1289 (footnote added). The court held that the School Code and the Election Code must be read *in pari materia* because "our courts have long looked to the Election Code's registration and residency requirements in determining who may be considered a registered voter residing in the detachment area." *Id.* Therefore, the court concluded, the Election Code provisions governing challenge and correction of the voter registration list must be employed, even when determining the number of registered voters against which to measure the sufficiency of a petition for detachment.[19]

### The Supplemental Voter List

Section 3–16 also provides the mechanics for challenging the supplemental voter registration list. Md.Code Ann., Art. 33,

---

**18.** Section 4–12 set forth the statutory remedy for challenging the voter registration list.

**19.** The court also held that the provisions of the Election Code governing form and content of various petitions was not applicable to the detachment petition. *Id.* 71 Ill.Dec. at 922, 451 N.E.2d at 1289. The court concluded that because the School Board had established standards dictating the form and content of detachment petitions, plaintiffs had no duty to browse through the Election Code and determine which provisions were close enough to a petition for detachment, "particularly where there was an established practice of the Board upon which they could rely." *Id.*

§ 3–2(d)(9) authorizes a municipal corporation to administer and maintain a supplemental voter registration list of those people who are not registered with the County Board of Elections but who may otherwise be qualified to register to vote with a municipal corporation. Ocean City maintains a supplemental voter registration list in conjunction with the universal registration list. Section 3–2(d)(10) provides:

(i) Whenever the registration of any voter is removed for any reason from the supplemental voter registration list maintained by the municipal corporation, the municipal corporation shall send a notice of this action and the reason for the action to the last known address of the voter.

(ii) The voter shall be given at least 15 days to respond to indicate whether the voter wishes to remain on the municipal corporation's voter registration list.

(iii) If the voter wishes to remain on the list and continues to be qualified under the municipal corporation's voter registration requirements, the voter's name shall be reinstated to the municipal corporation's supplemental voter registration list upon written request of the voter.

There is nothing in either §§ 3–2(d)(9) or 3–2(d)(10) to preclude the application of § 3–16 to the supplemental voter registration list. Section 3–16 provides regulations for the challenge of a registered voter up until the removal of that voter from the registration list. Section 3–2(10) provides additional due process safeguards for a voter that ultimately is removed from the supplemental list, ensuring that he or she receives notice and is provided at least 15 days to respond. Finally, § 3–2(10) allows the voter to remain on the supplemental list if he or she meets the voter eligibility requirements of the municipal corporation's charter. These provisions are not inconsistent with the procedures set forth in § 3–16.

Therefore, § 3–16 was also available to appellee to challenge the supplemental voter registration in the same

manner as the universal voter registration list.[20] As explained in *Lee* and *DuBois, supra,* "where a special statutory remedy is provided, that remedy is usually deemed exclusive, and 'the litigant must adopt that [remedy] and must not by-pass the administrative body or official, by pursuing other remedies.'" *DuBois,* 280 Md. at 533, 375 A.2d 1098 (quoting *Schneider v. Pullen,* 198 Md. 64, 68, 81 A.2d 226 (1951)). As appellee neglected to employ the remedies provided for in § 3–16, those people listed on the supplemental voter registration list, as incorporated into the Ocean City voter registration, are presumed to be qualified voters as of 16 February 1993, the day appellee submitted his petition.

■ In summary, § 3–16 is the exclusive statutory remedy for challenging a voter registration list in the State of Maryland. Because these provisions provide a mechanism to ensure the accuracy of the lists and maintain the integrity of the process, both the universal and the supplemental voter registration list are presumed conclusive of the total number of qualified voters as of the day the referendum petition is submitted.[21] As appellee did not avail himself of these reme-

---

20. We are aware of an Opinion of the Attorney General, 75 Op. Att'y Gen. ___ (4 April 1990) ("Article 33, Sec. 3–20 of the Maryland Code does not apply to registration lists maintained by municipalities and does not preclude a town's application of its separate purge provision."), that supports our conclusion that § 3–16 applies to the universal list, a component of the Ocean City voter registration list. That opinion would also seem to imply that § 3–16 may not apply to the voter-initiated challenges to the qualifications of persons appearing on the supplemental list, irrespective of whether the municipality has adopted an analog to the procedures set forth in § 3–16. To associate ourselves in our resolution as to the supplemental list with the implicit conclusion of the Attorney General's Opinion would create a void in this case. The City Council has not seen fit in its charter to enact anything establishing a methodology for voter-initiated challenges to the supplemental list. If § 3–16 does not apply to fill that void, then one may reasonably wonder whether appellee and others similarly situated are free to determine the content and the timing of such challenges, thereby making the municipality dance to their tune. Nature and this Court abhor a vacuum.

21. We are not unaware of a possible scenario in which a circumspect City Council could pass an ordinance within 45 days prior to a non-

dies, the Ocean City voter registration list is the list of qualified voters as of 16 February 1993.[22]

## II.

Because appellant is successful as to its first issue, we need not reach appellants' second issue, namely that misspelled, inaccurate, or unregistered signatures on a referendum petition may be properly rejected. We would note, however, that this issue was not preserved for appeal and therefore is not properly before this Court.

It is customary that an issue not raised in the court below is not preserved for appellate review. Md.Rule 8–131(a). Indeed it is a rule of long standing that this Court will not decide questions that have not been raised and decided by the trial court. *Squire v. State*, 280 Md. 132, 368 A.2d 1019 (1977); *Washington Homes, Inc. v. Baggett*, 23 Md.App. 167, 326 A.2d 206 (1974); *Dempsey v. State*, 24 Md.App. 8, 330 A.2d 204 (1974), *rev'd on other grounds*, 277 Md. 134, 355 A.2d 455 (1976).

Appellants raise this issue "for the purpose of avoidance of remand for its consideration by the circuit court." Appellee, however, concedes that this issue was not raised in the circuit court. Therefore, it is waived, and appellants need not fear its reemergence on remand, for once it is waived, it is waived.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR WORCESTER COUNTY WITH

---

municipal election, thereby precluding a referendum petitioner from challenging the voter registration list. *See* Md.Code Ann., Cts. & Jud.Proc. § 3–16(b)(2) ("The application or challenge may be made at the office of the board at anytime except during the 45 days prior to any election."). As this provision did not affect the instant case, we believe that such an application of § 3–16 is needful of legislative, and not judicial, attention.

**22.** It is not apparent from the record which of appellee's challenges were to the universal list and which were to the supplemental list. This omission, however, is unimportant in that appellee did not make his challenges to either list pursuant to § 3–16 and therefore they all are invalid.

DIRECTION THAT IT ENTER AN ORDER AFFIRMING THE DECISION OF THE CITY COUNCIL OF OCEAN CITY; APPELLEE TO PAY THE COSTS.