693 A.2d 757

**Vincent dePaul GISRIEL, Jr.**

**v.**

**The OCEAN CITY BOARD OF SUPERVISORS OF ELECTIONS et al.**

**No. 5, Sept. Term, 1995.**

Court of Appeals of Maryland.

May 1, 1997.

Reconsideration Denied June 9, 1997.

Christopher F. Davis (Philip C. Smith, Hearne & Bailey, P.A., on brief), Salisbury, for Petitioner.

Guy R. Ayres, III (Ayres, Jenkins, Gordy & Almand, P.A., on brief), Ocean City, for Respondents.

Argued before MURPHY, C.J.,* and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL, and RAKER, JJ.

ELDRIDGE, Judge.

This case arose because of the refusal by the City Council of Ocean City, Maryland, to authorize, pursuant to a referendum petition, a referendum on a recently enacted comprehensive rezoning ordinance. The issues concern the appealability of the circuit court decision, as well as the duties and responsibilities of Ocean City officials with regard to the City's registered voter list and the procedure for determining the validity of referendum petitions.

## I.

The Mayor and City Council of Ocean City enacted a comprehensive rezoning ordinance on January 19, 1993. Shortly thereafter, a group of local citizens, led by the petitioner Vincent Gisriel, filed a petition pursuant to Maryland Code (1957, 1996 Repl.Vol.) Art. 23A, § 2(b)(30), and the Ocean City Charter, to bring the zoning ordinance to referendum.[1] The Ocean City Solicitor approved the form of the

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

1. Article 23A, § 2(b)(30), relating to the powers of municipalities, states as follows:

referendum petition, and the petition was then forwarded to the Ocean City Board of Supervisors of Elections (the Board) for a determination of whether Gisriel had obtained a sufficient number of signatures to place the zoning ordinance before the electorate. Gisriel's petition contained 1,013 signatures.

Section C–411 of the Ocean City Charter sets forth the general procedures for petitioning an ordinance to referendum.[2] The specific dispute in this case is over § C–411's requirement that a referendum petition contain the signatures of at least "20% of the qualified voters" of Ocean City. Upon learning that the Board's standard practice for determining whether referendum petitions met this requirement was to

---

"(b) In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, such legislative body also shall have the following express ordinance-making powers:

\* \* \*

(30) To provide reasonable zoning regulations subject to the referendum of the voters at regular or special elections."

**2.** Section C–411 of the Ocean City Charter provides, in pertinent part, as follows:

"Following approval of any ordinance by the Mayor or passage of any ordinance over the Mayor's veto, the petitioners shall have three (3) business days to prepare the petition and present the same to the city solicitor for approval. The city solicitor shall have five (5) business days to approve said petition. If the city solicitor fails to act upon the petition within five (5) days, it shall be considered approved. Provided that the petition is submitted within said three-day period and is approved as aforesaid, the petitioners shall have twenty (20) days from the date of approval to obtain the signatures of twenty percent (20%) of the qualified voters of the town upon the petition. If the petitioners take more than three (3) days to submit a petition, which is approved as aforesaid, then, in that event, the twenty-day period to obtain signatures shall be reduced by the number of days in excess of three (3) that it took to submit the approved petition. If an approved petition is filed within the prescribed time period, with the Clerk–Treasurer containing the signatures of not less than twenty percentum (20%) of the qualified voters of the town and requesting that the ordinance, or any part thereof, be submitted to a vote of the qualified voters of the town for their approval or disapproval, the Council shall have the ordinance, or the part thereof requested for referendum, submitted to a vote of the qualified voters of the town at the next regular town election or, in the Council's discretion, at a special election occurring before the next regular election."

compare the names on a submitted petition with the City's list of registered voters as of the date the petition was filed, Gisriel notified the Board that, in his view, the list of registered voters contained the names of several unqualified voters.

After comparing the names on the petition with the registered voter list, and after checking the status of persons asserted by Gisriel to be unqualified voters, the Board recommended to the City Council that Gisriel's petition be denied because it did not contain the names of at least 20% of the City's qualified voters.[3] According to the Board, the number of registered voters in Ocean City was 4,903 as of February 16, 1993, the date that the referendum petition was filed. The Board struck 66 of the 1,013 signatures on the submitted petition because they were duplicative, were the names of non-registered voters, or were otherwise "rejected signatures." The remaining 947 signatures constituted only 19.31% of the 4,903 registered voters in Ocean City, a figure less than the 20% threshold requirement.[4] Following an initial decision by the City Council that the number of valid signatures was insufficient, Gisriel, pursuant to § C–505 of the Charter, requested an opportunity to be heard before the Council in order to present evidence contradicting the Board's findings.

At a regularly scheduled Council meeting, Gisriel explained to the Council that the Ocean City voter registration list used by the Board is based on two voter registration rolls, the Worcester County "Universal List" and the Ocean City "Mu-

---

**3.** At a public Council meeting held on March 15, 1993, Mary Adeline Bradford, the Chairperson of the Ocean City Board of Supervisors of Election, explained that

"[the Board] looked into duplications, incorrect information, information to be verified ... [P]ossible duplicates submitted by Mr. Gisriel and verified were three names.... Incorrect information submitted by Mr. Gisriel was 183 names. These were either folks who were ... reported to be deceased, who were not deceased, or people who were reported to have moved and [who had] not moved."

**4.** This figure was later revised slightly as a result of the removal of three duplicate names from the registered voter roll. The revised signature percentage was 19.32%, still less than the 20% necessary to place the zoning ordinance on the ballot.

nicipal Only" or "Supplemental List." [5]   Gisriel alleged, and produced evidence designed to support his allegation, that the voter registration list contained the names of 294 individuals who failed to meet the requirements for qualified voters under the provisions of the Charter.[6]   Gisriel maintained that if the Board had removed the names of these allegedly unqualified voters from the list of registered voters, so that the list contained only the names of the City's registered and qualified voters, the number of signatures submitted on his referendum petition would have exceeded 20% of the City's qualified voters, requiring the City Council to place the ordinance on the ballot for consideration by the Ocean City electorate.[7]

---

**5.** As pointed out by Gisriel, the official voter registration list for Ocean City is a combination of two lists, a "Universal List" and a "Supplemental List." The Universal List contains the names of persons presumably residing in Ocean City, who register to vote with the Worcester County Election Board for state, county and municipal elections pursuant to the provisions of the State Election Code, Maryland Code (1957, 1997 Repl.Vol.), Article 33, § 3–2. The Supplemental List contains the names of individuals, also presumably residing in Ocean City, who register to vote with the Ocean City Board of Elections only for Ocean City municipal elections pursuant to Article 33, § 3–1(b), of the State Election Code.

**6.** According to Gisriel, of the names on the Ocean City registered voter list used by the Board to measure the sufficiency of his referendum petition, 77 had been removed by the Worcester County Board of Supervisors of Election from the rolls of Worcester County; 19 were not registered with Worcester County or on the Ocean City supplemental list; 15 were confirmed by Worcester County as registered and living outside of Ocean City; 17 were deceased; 8 were duplicative names; and 30 names were of individuals who had relocated from Ocean City.

   The largest number of allegedly unqualified voters on Ocean City's registration list challenged by Gisriel consisted of 128 individuals who, although residents of Ocean City, had failed to vote in the last two Ocean City elections immediately preceding the filing of the referendum petition.

**7.** If all the names challenged by Gisriel in fact were names of unqualified voters, the number of registered and qualified voters in Ocean City on February 16, 1993, the date Gisriel's referendum petition was filed, would have been 4,609 instead of 4,903 as indicated by the Board. Therefore, if all 947 signatures in the petition were of registered and qualified voters of Ocean City, then Gisriel's petition actually contained

Despite Gisriel's submission, the Council voted to reaffirm its initial decision upholding the recommendation of the Board.

Thereafter, Gisriel instituted the present action in the Circuit Court for Worcester County, naming the City, the Board and the Council as defendants.[8]  After a hearing, the circuit court issued an opinion and order.  As a preliminary matter, the court rejected the City's contention that a comprehensive rezoning ordinance was not subject to referendum under the state statute, Art. 23A, § 2(b)(30).  Addressing the merits of Gisriel's suit, the circuit court noted that there was a difference between a "qualified voter" and a "registered voter" as those terms were used in the Ocean City Charter, and the court concluded that the Board's and Council's "refusal to strike the unqualified but registered voters from the voter roll as of the date the Petition was timely delivered ... [was] erroneous as a matter of law...."  The circuit court ordered the Board to "cull [the City's registered] voter roll of unqualified ... voters" prior to determining the percentage of qualified voters who had signed the petition.

The defendants appealed to the Court of Special Appeals, which reversed.  *Ocean City Board v. Gisriel,* 102 Md.App. 136, 648 A.2d 1091 (1994).  After raising *sua sponte* the question of whether it had jurisdiction, the Court of Special Appeals concluded that it had jurisdiction to entertain the appeal.  The intermediate appellate court held that, absent fraud or misconduct by election officials, the list of registered voters is presumed to be the list of all qualified voters at any given point in time, so long as there are appropriate remedies

the names of 20.54% of the City's qualified voters, a sufficient percentage to satisfy the requirements of § C–411 of the Ocean City Charter.

8.  Section C–505 of the Ocean City Charter, invoked by Gisriel in his complaint, states as follows:

"If any person shall feel aggrieved by the action of the board of supervisors of elections in refusing to register or in striking off the name of any person or by any other action, such person may appeal to the Council.  Any decision or action of the Council upon such appeals may be appealed to the Circuit Court for the county within thirty (30) days of the decision or action of the Council."

available periodically to purge the list of unqualified voters. The Court of Special Appeals further held that the procedures enumerated in Maryland Code (1957, 1997 Repl.Vol.), Art. 33, § 3–16, were applicable to municipal elections and provided the mechanism for correcting errors in voting registration lists.

Gisriel then filed in this Court a petition for a writ of certiorari, arguing that the Court of Special Appeals erred in holding that the defendants were entitled to use the list of registered voters for the purpose of checking the petition, and arguing that the circuit court's decision was correct. This Court granted the petition, and we directed the parties to address an additional issue, namely whether the Court of Special Appeals had jurisdiction to entertain the defendants' appeal. We shall first address this jurisdictional issue.

## II.

### A.

It is an often stated principle of Maryland law that appellate jurisdiction, except as constitutionally authorized, is determined entirely by statute, and that, therefore, a right of appeal must be legislatively granted. *See, e.g., Maryland–Nat'l v. Smith,* 333 Md. 3, 7, 633 A.2d 855, 857 (1993) (" 'The right to take an appeal is entirely statutory, and no person or agency may prosecute an appeal unless the right is given by statute,' " quoting *Subsequent Injury Fund v. Pack,* 250 Md. 306, 309, 242 A.2d 506 (1968)); *Howard County v. JJM, Inc.,* 301 Md. 256, 261, 482 A.2d 908, 910 (1984); *State v. Bailey,* 289 Md. 143, 147, 422 A.2d 1021, 1024 (1980); *Estep v. Estep,* 285 Md. 416, 422, 404 A.2d 1040, 1043 (1979); *Smith v. Taylor,* 285 Md. 143, 146, 400 A.2d 1130, 1132, (1979); *Criminal Inj. Comp. Bd. v. Gould,* 273 Md. 486, 500, 331 A.2d 55, 64 (1975). Consequently, resolution of the jurisdictional issue depends upon an examination of the relevant provisions of the Maryland Code and of Ocean City's legislative enactments.

Section C–505 of the Ocean City Charter grants a right to appeal actions or decisions of the Board to the City Council,

and it provides for judicial review in the circuit court of the Council's decision. Section C–505, however, does not provide a right of appeal to the Court of Special Appeals. Furthermore, no other provision of the Ocean City Charter or the Ocean City ordinances authorize an appeal to the Court of Special Appeals under the circumstances here.

Maryland Code (1957, 1995 Repl.Vol.), § 12–301 of the Courts and Judicial Proceedings Article, which is the general statute authorizing appeals from the circuit courts, provides that "a party may appeal from a final judgment entered in a civil or criminal case by a circuit court." Section 12–301 goes on specifically to grant a right of appeal "from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law." [9]

Section 12–302(a) of the Courts and Judicial Proceedings Article, however, limits § 12–301's broad grant of the right to appeal, providing as follows:

"(a) Unless a right of appeal is expressly granted by law, § 12–301 does not permit an appeal from a final judgment of a court entered or made in the exercise of appellate jurisdiction in reviewing the decision of the District Court, an administrative agency, or a local legislative body."

The Court of Special Appeals' decision concerning its jurisdiction in the present case was based on that Court's interpretation and application of § 12–302(a). Therefore, we shall briefly review the historical background of § 12–302(a)'s limitation on the right of appeal.

---

9. Section 12–301 in its entirety states as follows:

"**§ 12–301. Right of appeal from final judgments—Generally.**

"Except as provided in § 12–302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case a plaintiff who has accepted a remittitur may cross-appeal from the final judgment."

B.

The first general appeals statute enacted by the General Assembly after the Revolution was Ch. 87 of the Acts of 1785, § 6, which granted the "full power and right to appeal" to "any party or parties aggrieved by any judgment or determination of any county court in any civil suit or action, or any prosecution...." Despite the broad language of the 1785 statute, as well as subsequent broadly worded general appeals statutes, this Court construed the 1785 statute, and its successor statutes, to be inapplicable in a case where a county court, or later a circuit court, exercised a special limited statutory jurisdiction rather than its ordinary common law-type jurisdiction, and acted within that special limited statutory jurisdiction. When a county court or a circuit court was exercising a special limited statutory jurisdiction, and not a common law-type of jurisdiction, this Court regularly held that the general appeals statutes did not authorize an appeal, and that an appeal could be taken only if authorized by a specific statute relating to the particular type of statutory jurisdiction being exercised. *See Wil. & Susq. R.R. Co. v. Condon,* 8 G. & J. 443, 448, 449 (1837), where the principle was initially adopted and discussed. This rule of construction was subsequently applied by this Court in a variety of contexts, including judgments of county courts or circuit courts reviewing decisions by justices of the peace, *Herzberg v. Adams,* 39 Md. 309, 312 (1874); *Hough v. Kelsey & Gray,* 19 Md. 451, 455–456 (1863); *State v. Mister,* 5 Md. 11, 15 (1853); *Crockett v. Parke,* 7 Gill. 237, 240 (1848); judgments of the Baltimore City Court reviewing judgments of People's Court of Baltimore City, *Montgomery Ward v. Herrmann,* 190 Md. 405, 408–411, 58 A.2d 677, 678–680 (1948); judgments of county and circuit courts reviewing decisions of local government officials, *Co. Commrs. Harford Co. v. Jay,* 122 Md. 324, 327, 89 A. 715, 717 (1914); *Stephens v. M. & C. of Crisfield,* 122 Md. 190, 192–193, 89 A. 429, 429–430 (1914); *Webster v. Cockey,* 9 Gill. 92, 93–95 (1850); circuit court judgments reviewing certain decisions of orphans' courts, *Lammott v. Maulsby,* 8 Md. 5, 8–9 (1855); and circuit court judgments in actions for judicial review of

administrative agency decisions, *Simpler v. State, Use of Boyd,* 223 Md. 456, 460–461, 165 A.2d 464, 466 (1960); *Johnson v. Board of Zoning Appeals,* 196 Md. 400, 406–407, 76 A.2d 736, 738 (1950). *See also Sugar v. North Balto. M.P. Church,* 164 Md. 487, 498–500, 165 A. 703, 707–708 (1933) (collecting several other types of circuit court decisions rendered pursuant to special statutory jurisdiction); *Savage Man. Co. v. Owings,* 3 Gill. 497, 498–499 (1846).

The rule precluding, under the general appeals statute, appeals from circuit court judgments in cases of special limited statutory jurisdiction, persisted despite several recodifications of the general appeals statutes by the Legislature containing no mention of the rule. Furthermore, in later years, the rule was frequently applied to limit appeals from circuit court judgments reviewing decisions of administrative agencies. *See, e.g., Pr. Geo's Co. v. American Federation,* 289 Md. 388, 397–400, 406, 424 A.2d 770, 774–776, 779 (1981); *Urbana Civic v. Urbana Mobile,* 260 Md. 458, 461, 272 A.2d 628, 630 (1971) (" 'The rule is that where an inferior court exercises a special limited jurisdiction which is conferred by statute, no appeal from its decision in such cases lies to this [C]ourt unless expressly given by the statute' "); *Md. Pharmacy Board v. Peco,* 234 Md. 200, 202, 198 A.2d 273, 274 (1964) ("the provisions of [the general appeal statute] do not apply to cases where the trial court exercises a special or limited jurisdiction conferred by statute"); *Hart v. Comm. of Motor Vehicles,* 226 Md. 584, 587, 174 A.2d 725, 726 (1961); *Simpler v. State, Use of Boyd, supra,* 223 Md. at 460–461, 165 A.2d at 466; *Bd. of Med. Examiners v. Steward,* 203 Md. 574, 580–581, 102 A.2d 248, 251 (1954); *Johnson v. Board of Zoning Appeals, supra,* 196 Md. at 406–407, 76 A.2d at 738; *Abbott v. Administrative Hearing Board,* 33 Md.App. 681, 685–686, 366 A.2d 756, 759 (1976), *cert. denied,* 280 Md. 727 (1977); *Prince George's County v. Fahey,* 28 Md.App. 312, 315–316, 345 A.2d 102, 104–105 (1975).

In 1973, the General Assembly recodified the appeals statutes in its enactment of the Courts and Judicial Proceedings Article of the Code, which became effective on January 1,

1974.[10]   With its enactment of § 12–301, the Legislature retained the broad, general grant of the right to appeal.   In addition, § 12–301 partially abrogated the above-discussed rule by expressly stating that the right of appeal existed "from a final judgment by a court in the exercise of original, special, limited, statutory jurisdiction" unless expressly denied by law. Thus the Legislature abolished a large part of the doctrine disallowing appeals from circuit court judgments entered pursuant to the exercise of special limited statutory jurisdiction.[11]

The Legislature, however, expressly retained a portion of the doctrine by its enactment of § 12–302(a), which makes § 12–301 inapplicable to appeals from final judgments of circuit courts reviewing decisions of the District Court, administrative agencies, or local legislative bodies.   Nevertheless, judgments of the circuit courts reviewing decisions of the District Court are generally subject to further discretionary appellate review by petitions for writs of certiorari filed in the Court of Appeals.   *See* §§ 12–305 and 12–307(2) of the Courts and Judicial Proceedings Article.   Moreover, appeals to the Court of Special Appeals from judgments of the circuit courts reviewing decisions of most *state* administrative agencies are generally authorized by the Maryland Administrative Procedure Act, Code (1984, 1995 Repl.Vol.), § 10–223(b) of the State Government Article.   Consequently, the viability of the nonappealability principle adopted in *Wil. & Susq. R.R. Co. v. Condon, supra,* 8 G. & J. at 448–449, and partially embodied in § 12–302(a) of the Courts and Judicial Proceedings Article, is today largely limited to circuit court judgments in cases involving statutory judicial review of adjudicatory or quasi-judicial decisions by *local* government administrative agencies

---

10.   See Ch. 2, § 1, of the Acts of 1973, 1st Special Session.

11.   *See* Revisor's Note to Maryland Code (1974), § 12–301 of the Courts and Judicial Proceedings Article.   *See also* Judge Rodowsky's discussions for the Court in *Litton Bionetics v. Glen Constr.,* 292 Md. 34, 40–41, 437 A.2d 208, 211–212 (1981), and in *Pr. Geo's Co. v. American Federation,* 289 Md. 388, 397–400, 424 A.2d 770, 774–776 (1981).

and legislative bodies.[12]

## C.

In holding that § 12–302(a) of the Courts and Judicial Proceedings Article did not preclude an appeal of the circuit court's judgment in this case, the Court of Special Appeals pointed to the language of § 12–302(a) which states that "§ 12–301 does not permit an appeal from a final judgment of a court entered ... *in the exercise of appellate jurisdiction* in reviewing the decision of ... an administrative agency, or a local legislative body." (Emphasis added). The Court of Special Appeals, construing this language in its most literal sense, held that § 12–302(a) is applicable only when the court below is exercising "appellate" jurisdiction rather than "original" jurisdiction. The Court of Special Appeals thus explained (102 Md.App. at 147, 648 A.2d at 1095–1096):

> "The issue, therefore, is whether the circuit court, in the case *sub judice*, exercised original or appellate jurisdiction when it reviewed the City Council's decision to affirm the Board's denial of appellee's petition."

Next, the Court of Special Appeals, citing and quoting from *Shell Oil Co. v. Supervisor*, 276 Md. 36, 43, 47, 343 A.2d 521, 525, 527 (1975), reiterated the principle of Maryland constitutional law that circuit court review of decisions by administrative agencies or local government bodies constitutes an exercise of original jurisdiction and not appellate jurisdiction. 102 Md.App. at 147–149, 648 A.2d at 1096–1097. Since, under the Court of Special Appeals' interpretation, § 12–302(a)'s limita-

---

12. Legislative or quasi-legislative decisions of local legislative bodies or administrative agencies are, of course, not subject to ordinary judicial review; instead, they are subject to very limited review by the courts. *See, e.g., County Council v. Offen*, 334 Md. 499, 507, 639 A.2d 1070, 1073–1074 (1994); *Judy v. Schaefer*, 331 Md. 239, 265–266, 627 A.2d 1039, 1052–1053 (1993); *Dep't of Nat. Res. v. Linchester*, 274 Md. 211, 221–224, 334 A.2d 514, 521–524 (1975) (where an administrative agency or governmental body "is acting in a manner which may be considered legislative in nature ..., the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries").

tion on the right to appeal from circuit court judgments is applicable only when a circuit court is technically exercising *appellate* jurisdiction, and since the circuit court's review of the City Council's decision in the present case was an exercise of *original* jurisdiction, § 12–302(a)'s limitation on the right to appeal was held to be inapplicable in the present case. For this reason, the Court of Special Appeals held that it had jurisdiction under § 12–301 to entertain the appeal.

Although we shall hold, on entirely different grounds, that the Court of Special Appeals did have jurisdiction over this appeal, we flatly reject that court's interpretation of § 12–302(a).[13]

As indicated by the Court of Special Appeals, whenever a circuit court directly reviews the action, or inaction, of any administrative agency, governmental body, or official in the executive or legislative branches of government, including local government, the court is exercising original jurisdiction and not appellate jurisdiction. *Shell Oil Co. v. Supervisor, supra,* 276 Md. at 43, 343 A.2d at 525 ("[T]he exercise of appellate jurisdiction requires a prior action by some *judicial* authority, or the prior exercise of *judicial* power.... [R]eview of the decisions of an administrative agency is an exercise of original jurisdiction and not of appellate jurisdiction"). *See Medical Waste v. Maryland Waste,* 327 Md. 596, 604–605 n. 5, 612 A.2d 241, 245 n. 5 (1992); *In re Petition for Writ of*

---

13. It should be noted that the Court of Special Appeals' interpretation of § 12–302(a) in the present case is inconsistent with that court's prior interpretation and application of § 12–302(a). *See, e.g., Department v. Harmans,* 98 Md.App. 535, 542 n. 2, 633 A.2d 939, 943 n. 2 (1993); *Levitz Furniture Corp. v. P.G. County,* 72 Md.App. 103, 108, 527 A.2d 813, 816, *cert. denied,* 311 Md. 286, 533 A.2d 1308 (1987); *Abbott v. Administrative Hearing Board,* 33 Md.App. 681, 685–686, 366 A.2d 756, 759 (1976), *cert. denied,* 280 Md. 727 (1977); *Prince George's County v. Fahey,* 28 Md.App. 312, 315–316, 345 A.2d 102, 104–105 (1975). The Court of Special Appeals' interpretation of § 12–302(a) in the case at bar is also inconsistent with this Court's opinion in *Pr. Geo's Co. v. American Federation, supra,* 289 Md. at 397–400, 424 A.2d at 774–776, although the *American Federation* opinion did not discuss the precise ground for the Court of Special Appeals' interpretation in the present case.

*Prohibition,* 312 Md. 280, 294, 539 A.2d 664, 671 (1988); *Montgomery Co. v. Ian Corp.,* 282 Md. 459, 467, 385 A.2d 80, 84 (1978). In a technical, constitutional meaning of the term, a circuit court *never* exercises "appellate jurisdiction" when it directly reviews the decision of an administrative agency or a local government body.

Consequently, under the holding of the Court of Special Appeals, the language in § 12–302(a) relating to administrative agencies and local legislative bodies could never be given any effect. If § 12–302(a) is applicable only when a court is exercising "appellate jurisdiction" in a technical, constitutional sense, and if a court never exercises such appellate jurisdiction when directly reviewing the action of an administrative agency or local legislative body, then the statutory language has utterly no effect. The Court of Special Appeals' interpretation represents a striking violation of the principle that a court should not "interpret a statutory scheme so as to render any part of it meaningless or nugatory." *Fraternal Order of Police v. Mehrling,* 343 Md. 155, 180, 680 A.2d 1052, 1065 (1996). *See, e.g., C & P Telephone v. Director of Finance,* 343 Md. 567, 579–580, 683 A.2d 512, 517–518 (1996); *DeBusk v. Johns Hopkins,* 342 Md. 432, 445, 677 A.2d 73, 79 (1996) ("We will not read the statute to render subsection (c) unnecessary, as one of our cardinal rules . . . is not to find any [statutory] word, clause, sentence, or phrase . . . superfluous, meaningless, or nugatory"); *Schlossberg v. Citizens Bank,* 341 Md. 650, 660, 672 A.2d 625, 629–630 (1996) ("such an interpretation would contravene the basic rule . . . that a statute should be construed so that no word is rendered superfluous or meaningless"); *State v. Pagano,* 341 Md. 129, 134, 669 A.2d 1339, 1341 (1996) ("We seek to read statutes 'so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory'"); *In re Roger S.,* 338 Md. 385, 394, 658 A.2d 696, 700 (1995).

A broader construction of the phrase "appellate jurisdiction" in § 12–302(a), so as to include ordinary statutory judicial review of adjudicatory decisions by administrative agencies and local legislative bodies, would be in accord with the history

of § 12–302(a) and with the normal usage of the language when § 12–302(a) was enacted.

The history of § 12–302(a), discussed earlier, discloses that the statute represents a partial codification of the principle that the general appeals statute does not authorize an appeal from a circuit court's judgment when that court is exercising a special limited statutory jurisdiction as opposed to a more traditional common law-type of jurisdiction. As previously pointed out, this principle was regularly applied to statutory actions for judicial review of administrative agency and local government decisions. *See, e.g., Urbana Civic v. Urbana Mobile, supra,* 260 Md. at 460–461, 272 A.2d at 630; *Bd. of Med. Examiners v. Steward, supra,* 203 Md. at 580–581, 102 A.2d at 251; *Johnson v. Board of Zoning Appeals, supra,* 196 Md. at 406–407, 76 A.2d at 738. Although the statutory judicial review actions in those cases were clearly *original* actions under the teaching of *Shell Oil Co. v. Supervisor, supra,* 276 Md. at 43–47, 343 A.2d at 525–527, nevertheless § 12–302(a) was intended to embody the holdings of *Urbana, Steward, Johnson,* and similar cases. *See Pr. Geo's Co. v. American Federation, supra,* 289 Md. at 398–400, 424 A.2d at 775–776; *Abbott v. Administrative Hearing Bd., supra,* 33 Md.App. at 685–686, 366 A.2d at 759. Consequently, the history of § 12–302(a) indicates that the statute is applicable to statutory judicial review actions even though such actions technically do not represent exercises of a circuit court's appellate jurisdiction.

Section 12–302(a) was enacted by the General Assembly in 1973, and the opinion in *Shell Oil Co. v. Supervisor, supra,* was rendered two years later in 1975. Prior to the opinion in the *Shell Oil* case, and at the time § 12–302(a) was enacted, statutory circuit court actions for judicial review of decisions by administrative agencies or local legislative bodies were regularly called "appeals" and treated as if they fell within the appellate jurisdiction of the circuit courts. *See, e.g., Criminal Inj. Comp. Bd. v. Gould, supra,* 273 Md. 486, 331 A.2d 55 (using, throughout the opinion, the terms "appeal" and "appellate" jurisdiction interchangeably with the term "judicial re-

view"); *Public Serv. Comm'n v. Balto. Gas & El.*, 273 Md. 357, 359, 329 A.2d 691, 693 (1974) ("The Company *appealed* [from the Commission] to the Circuit Court for Calvert County"); *St. Comm'n on Human Rel. v. Malakoff*, 273 Md. 214, 217, 329 A.2d 8, 11 (1974) ("appellees sought redress from the adverse [administrative] decision by *appealing* to the Circuit Court for Prince George's County"); [14] *Board of Appeals v. Marina Apts.*, 272 Md. 691, 695, 326 A.2d 734, 736 (1974) ("Marina promptly *appealed* this Board action to the Circuit Court for Montgomery County"); *Rogers v. Radio Shack*, 271 Md. 126, 128, 314 A.2d 113, 115 (1974) ("Rogers *appealed* the administrative decision to the Circuit Court"); *Lucky Stores v. Bd. of Appeals*, 270 Md. 513, 522, 312 A.2d 758, 763 (1973) (referring to the circuit court case as being "on *appeal*" from the Board of Appeals); *Valenzia v. Zoning Board*, 270 Md. 478, 482, 312 A.2d 277, 279 (1973) (zoning case constituted an *"appeal* to the Circuit Court for Howard County"); *American Oil Co. v. Bd. of Appeals*, 270 Md. 301, 302, 310 A.2d 796, 796–797 (1973) ("The Circuit Court ... on *appeal* passed an order ... affirming the Board"); *Urbana Civic v. Urbana Mobile, supra*, 260 Md. at 460, 272 A.2d at 630 (involved an "initial *appeal* to the circuit court" purportedly under a local ordinance stating that an " '[a]ppeal* from the action of the Board of County Commissioners may be presented to the Circuit Court' "); *Johnson v. Board of Zoning Appeals, supra*, 196 Md. at 407, 76 A.2d at 738 ("we specifically hold that no right of appeal exists to review a decision of the Circuit Court *sitting as an appellate court* in a zoning case, unless the Legislature has authorized an appeal"). (Emphasis added).[15]

---

14. The index to volume 273 of the Maryland Reports, 273 Md. at 744, as well as the indices to numerous earlier and later volumes, list actions for judicial review of administrative decisions under the topic "appeals."

15. Not only did cases prior to *Shell Oil v. Supervisor* treat actions for judicial review of administrative decisions as "appeals," but several opinions in this Court after the *Shell* case, including some by the author of the *Shell* opinion, improperly referred to such actions as "appeals." *See, e.g., Williams v. Wm. T. Burnett & Co.*, 296 Md. 214, 218, 462 A.2d 66, 68 (1983); *Brown v. Baer*, 291 Md. 377, 381, 435 A.2d 96, 98 (1981);

Moreover, both before and after the time § 12–302(a) was enacted, numerous statutes, both state and local, referred to administrative judicial review actions in the circuit courts as "appeals." *See, e.g.,* Code (1957, 1994 Repl.Vol.), Art. 49B, § 10(d) (stating that a particular type of order by the State Human Relations Commission "is a final order *appealable* to the circuit court"); Code (1957, 1994 Repl.Vol.), Art. 48A, § 40 (referring in several instances to *"appeals"* from orders of the Insurance Commissioner to the courts, providing for a "notice of *appeal*," and stating that the Insurance Commissioner shall be an "appellee" in the circuit court proceedings); Code (1988, 1996 Supp.), § 13–532(a)(2) of the Tax–General Article (stating that, in a tax case, "[a]ny party to the ... proceeding, including a governmental unit, may *appeal* a final order ... to the circuit court"). (Emphasis added). The Maryland Rules in 1973, and continuously until July 1, 1993, when the correct terminology was adopted, referred to circuit court actions reviewing administrative decisions as "appeals" and treated them as appeals. *See* Ch. 1100, Subtitle B, of the former Rules. In fact, the very provision of the Ocean City Charter invoked by Gisriel in the case at bar, § C505 of the Charter, states that a decision of the City Council "may be *appealed* to the circuit court...." (Emphasis added).

Therefore, when § 12–302(a) was enacted, a reference to circuit court review of administrative agency and local government decisions as an exercise of "appellate jurisdiction" was consistent with the normal usage of the language at the time. It is much more likely that the Legislature, in § 12–302(a), intended to refer to ordinary statutory judicial review actions instead of to exercises of appellate jurisdiction in a technical, constitutional sense. We fully agree with Chief Judge Wilner's comment for the Court of Special Appeals in *Department v. Harmans,* 98 Md.App. 535, 542 n. 2, 633 A.2d 939, 943 n. 2 (1993):

*Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 510, 390 A.2d 1119, 1122 (1978); *Employment Sec. Adm. v. Smith,* 282 Md. 267, 269, 383 A.2d 1108, 1110 (1978).

"In a technical, but to some extent jurisprudential, sense, a court does not exercise 'appellate jurisdiction' when reviewing the decision of an administrative agency or legislative body.

\* \* \*

"It has long been common, however, to treat these kinds of actions as being in the nature of appeals and to refer to them as 'administrative appeals.'

\* \* \*

"We have no doubt that, in crafting § 12–302(a) as it did, the Legislature had in mind actions of this type, to review the decisions of administrative and local legislative bodies, and so we shall construe the term 'appellate jurisdiction' in the manner the Legislature intended, rather than in its more narrow, but more appropriate, manner."

■ Accordingly we hold that, when a circuit court proceeding in substance constitutes ordinary judicial review of an adjudicatory decision by an administrative agency or local legislative body, pursuant to a statute, ordinance, or charter provision, and the circuit court renders a final judgment within its jurisdiction, § 12–302(a) is applicable, and an appeal to the Court of Special Appeals is not authorized by § 12–301. *See Pr. Geo's Co. v. American Federation, supra,* 289 Md. at 397–400, 424 A.2d at 774–776.

## D.

■ While disagreeing with the Court of Special Appeals' interpretation of § 12–302(a), we do agree with that court's decision that it had jurisdiction over the appeal. For reasons entirely different from those set forth by the Court of Special Appeals, we believe that § 12–302(a) is inapplicable to this case.

Although Gisriel did cite § C–505 of the Ocean City Charter in his circuit court complaint, the nature of his action was not a statutory judicial review action unknown to the common law

at the time when the principle embodied in § 12–302(a) was first adopted by this Court in *Wil. & Susq. R.R. v. Condon, supra,* 8 G. & J. at 448–449, and *Savage Man. Co. v. Owings, supra,* 3 Gill. at 498–499. Instead, Gisriel's action in substance was a traditional common law mandamus action, and the circuit court's judgment in substance resembled the type of order rendered in a mandamus proceeding.

This Court recently reviewed the nature of a traditional common law mandamus action in *Goodwich v. Nolan,* 343 Md. 130, 145–148, 680 A.2d 1040, 1047–1049 (1996). There, Judge Bell for the Court explained (343 Md. at 145, 680 A.2d at 1047):

> "[T]he common law writ of mandamus ... 'is an original action, as distinguished from an appeal,' ... [and] is ... 'an extraordinary remedy[,]' *Ipes v. Board of Fire Commissioners of Baltimore,* 224 Md. 180, 183, 167 A.2d 337, 339 (1961), 'that ... will not lie if [there is] any other adequate and convenient remedy[.]' .... [It is] generally used 'to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which ... is imperative and to the performance of which ... the [applicant] has a clear legal right.' *Criminal Injuries Compensation Board v. Gould,* 273 Md. 486, 514, 331 A.2d 55, 72 (1975).... [It] does not lie where the action to be reviewed is discretionary or depends on personal judgment."

*See, e.g., Board v. Secretary of Personnel,* 317 Md. 34, 46–47, 562 A.2d 700, 706 (1989); *George's Creek Coal & Iron Co. v. County Comm'rs of Allegany Co.,* 59 Md. 255, 259 (1883) ("Its [mandamus's] office ... is to compel ... public officers to perform their functions, or some particular duty imposed upon them").

Turning to the present case, Gisriel argued, and the circuit court agreed, that the Board had a non-discretionary duty to delete from the Ocean City registered voter list the names of unqualified voters before determining the percentage of voters

who had signed the petition. The circuit court's order concluded as follows:

"The Court finds that Ocean City must cull its voter roll of unqualified but registered voters before it can determine the percentage of voters who signed Gisriel's petition. The Court finds, given the facts of this case, that the date the Town must use to purge its voters roll is February 16, 1993.

"For the foregoing reasons, it is, ... by the Circuit Court for Worcester County, Maryland,

**ORDERED** that this case is **REMANDED** to the Mayor and City Council of Ocean City, Maryland, for **REMAND** to the Ocean City Board of Supervisors of Elections for further proceedings consistent with this Opinion."

If Gisriel's and the circuit court's view of the applicable law is correct, whenever a referendum petition is filed, and it is claimed that certain names on the registered voter list represent unqualified voters, the Board must determine whether or not such registered voters are unqualified, and delete the names of those found to be unqualified before deciding whether the petition contains the requisite percentage of signatures. Under the circuit court's holding, this is a ministerial duty imposed as a matter of law. It is the type of duty which, under the above-cited cases, is an appropriate subject for a common law mandamus action.

Any issues requiring the resolution of disputed facts would not arise until the Board begins to perform this duty. A subsequent judicial review of the manner in which the Board and Council performed the duty, involving the substantiality of the evidence supporting factual findings, the reasonableness of inferences and conclusions, etc., would constitute a judicial review action authorized by § C–505 of the Ocean City Charter. Section § 12–302(a) presumably would be applicable to such an action. But a court action to determine in the first instance whether the Board must perform the duty is, by its very nature, a traditional common law mandamus action.

As previously discussed, the non-appealability rule embodied in § 12–302(a) only applies when a circuit court exercises a

special limited statutory jurisdiction instead of a common-law type of jurisdiction. The reason given for the rule was that the "special limited jurisdiction given to the [trial] Court" to "review is a fit subject for litigation in [the trial] Court, but is wholly inappropriate to the jurisdiction of this Court." *Wil. & Susq. R.R. Co. v. Condon, supra,* 8 G. & J. at 448. Judge Chambers for the Court in *Savage Manufacturing Co. v. Owings, supra,* 3 Gill. at 498–499, explained the rule as follows:

> "Jurisdiction of this proceeding is not exercised by the County Court, in virtue of its general powers, as a Court of common law; it is vested by a special delegation of power and by the terms of the Act which confers it, to be exercised, not according to the forms and course of the common law, but in a special and peculiar mode.

> * * *

> "It is a general and sound rule that a writ of error will not lie to a Court vested with special jurisdiction, and which does not proceed according to the forms of the common law.

> * * *

> "This not being a case in which a writ of error would lie, and the Act ... being silent as to an appeal, we think the motion to dismiss must prevail."

Thus, whether sound or not, the non-appealability principle was based entirely on the conclusion that the trial court was exercising a statutory type of jurisdiction unknown to the common law.

Consequently, the principle embodied in § 12–302(a) has no application to common law actions. Both before and after the enactment of § 12–302(a), this Court has regularly exercised appellate jurisdiction in mandamus actions against administrative agencies and officials. *See, e.g., Goodwich v. Nolan, supra,* 343 Md. 130, 680 A.2d 1040; *Board v. Secretary of Personnel, supra,* 317 Md. at 45–49, 562 A.2d at 705–707; *Tabler v. Medical Mut. Liab. Ins.,* 301 Md. 189, 202–203, 482

A.2d 873, 880 (1984); *Bovey v. Exec. Dir., Health Claims,* 292 Md. 640, 441 A.2d 333 (1982); *Md. Act. For Foster Child. v. State,* 279 Md. 133, 138–139, 367 A.2d 491, 494 (1977); *State's Atty. v. City of Balto.,* 274 Md. 597, 608, 337 A.2d 92, 99 (1975); *State Health Dep't v. Walker,* 238 Md. 512, 522–524, 209 A.2d 555, 560–562 (1965); *Hammond v. Love,* 187 Md. 138, 49 A.2d 75 (1946); *Heaps v. Cobb,* 185 Md. 372, 45 A.2d 73 (1945); *Hecht v. Crook,* 184 Md. 271, 40 A.2d 673 (1945); *Walter v. Montgomery County,* 180 Md. 498, 25 A.2d 682 (1942). Furthermore, even where a particular action against an administrative agency was allegedly brought under a statutory judicial review provision, and did not purport to be a mandamus action, this Court has looked to the substance of the action, has held that it could be treated as a common law mandamus or certiorari action, and has exercised appellate jurisdiction. *Criminal Inj. Comp. Bd. v. Gould, supra,* 273 Md. at 500–506, 331 A.2d at 64–68.

Since Gisriel's action was in substance a common law mandamus action, the Court of Special Appeals had jurisdiction to entertain the appeal under § 12–301 of the Courts and Judicial Proceedings Article.[16]

---

**16.** Furthermore, even if Gisriel's action were not in substance a common law mandamus action, and if § 12–302(a) were applicable so as to preclude an appeal under § 12–301, an appeal to the Court of Special Appeals may have been authorized by Code (1957, 1995 Repl.Vol., 1996 Supp.), Art. 66B, § 4.08.

The right of referendum invoked in this case was not based on any general referendum authorization under local law. Rather, it was specifically based on the grant of zoning authority in Maryland Code (1957, 1996 Repl.Vol.), Art. 23A, § 2(b)(30), which empowers municipalities "[t]o provide reasonable zoning regulations subject to the referendum of the voters at regular or special elections." Art. 66B of the Maryland Code also relates, *inter alia,* to the zoning authority of municipalities, and this Court has held that Art. 23A and Art. 66B "must be read together." *Northeast Plaza v. Town of North East,* 310 Md. 20, 29–30, 526 A.2d 963, 968 (1987). *See also, e.g., Md.–Nat'l Cap. P. & P. v. Rockville,* 269 Md. 240, 247, 305 A.2d 122, 127 (1973); *Prince George's Co. v. Laurel,* 262 Md. 171, 183–184, 277 A.2d 262, 268–269 (1971); *City of Annapolis v. Kramer,* 235 Md. 231, 234, 201 A.2d 333, 335 (1964).

Art. 66B, § 4.08(a), authorizes judicial review of "any decision of the board of appeals, or [of] a zoning action by the local legislative body,"

## III.

Gisriel argues, and the circuit court held, that whenever a referendum petition is filed and an issue is presented concerning the requisite percentage of signatures, the Board has a duty to examine the qualifications of any challenged names on the voter registration list, and delete the names of those who are not qualified, before determining whether the petition contains the signatures of at least 20% of the qualified voters. The position of the City and of the Court of Special Appeals, on the other hand, is that the voter registration list is determinative of the number of qualified voters as long as there are procedures for periodically culling from the list the names of those who are no longer qualified.

Although we shall resolve this issue, we first point out that, in light of the undisputed facts of this case, the Court of Special Appeals' judgment would have to be affirmed under either of the above-described opposing views.

---

and § 4.08(e) authorizes an appeal to the Court of Special Appeals. In light of Art. 23A, § 2(b)(30), a city council's refusal to permit a referendum on a zoning ordinance may arguably be "a zoning action by the local legislative body."

In *Board v. Stephans*, 286 Md. 384, 397, 408 A.2d 1017, 1023 (1979), we held that § 4.08(a) did not authorize judicial review of comprehensive rezoning. Comprehensive rezoning, however, is legislative action. In the present case, Gisriel was not seeking judicial review of the comprehensive rezoning ordinance. Instead, he was seeking review of the non-legislative decision refusing to submit the zoning ordinance to the electorate.

Even if an appeal to the Court of Special Appeals was not authorized by § 4.08(a) and (e), it may have been authorized by § 4.08(f), which states as follows:

"In addition to the appeal provided in this section, a local legislative body may provide for appeal to the circuit court of any matter arising under the planning and zoning laws of the county or municipal corporation. The decision of the circuit court may be appealed to the Court of Special Appeals."

Section C–505 of the Ocean City Charter might be viewed as a local judicial review provision qualifying under § 4.08(f).

Because of our holding that the appeal in this case was authorized by § 12–301 of the Courts and Judicial Proceedings Article, we do not decide these issues concerning the scope of Art. 66B, § 4.08.

### A.

■ As noted early in this opinion, *supra* n. 6, under Gisriel's allegations and evidence, the largest category of allegedly unqualified voters on the Ocean City voter registration list consisted of 128 residents of Ocean City who had failed to vote in the last two Ocean City elections immediately preceding the filing of the referendum petition. According to Gisriel, these 128 residents were no longer qualified voters because of § C–504 of the Ocean City Charter. That section states in pertinent part as follows:

> "If any person has not voted in two (2) consecutive general municipal elections, it shall be the duty of the Board of Supervisors of Elections to strike his or her name from the list of eligible voters."

Section C–504 of the Ocean City Charter does not expressly state that frequent voting is a "qualification" or that the failure to vote in two consecutive general municipal elections renders one "unqualified" to vote.

Section C–403.A of the Ocean City Charter sets forth the "qualifications" for voting as follows:

> "The qualifications of voters in Town elections of Ocean City shall be as follows: A voter, whether a man or a woman, must be:
>
> (1) A citizen of the United States.
>
> (2) At least eighteen (18) years of age.
>
> (3) Registered in accordance with the provisions of this Charter.
>
> (4) One who, for thirty (30) days next preceding the election, has been and is, at the time of the election domiciled within the corporate limits of the Town of Ocean City."

Being a frequent voter is not included among the qualifications listed in § C–403.A.

Moreover, this Court has held that, under Article I, §§ 1 and 4 of the Maryland Constitution, being a frequent voter, or having voted in a specified number of prior elections, is not

and cannot be a qualification for voting.[17]   Recently in *State Election Bd. v. Election Bd. of Balt.*, 342 Md. 586, 598–599, 679 A.2d 96, 102 (1996), we stated:

"The qualifications for voting in Maryland are prescribed in Article I, §§ 1 and 4, of the Maryland Constitution.   In order to vote, one must be a citizen of the United States, eighteen years of age or older, and a resident of Maryland.   In addition, the General Assembly may regulate or prohibit the right to vote of one convicted of a serious crime or under care or guardianship for mental disability.   These prerequisites are the exclusive qualifications for voting in Maryland.   *See* Article 7 of the Maryland Declaration of Rights ('every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage'); *Jackson v. Norris*, 173 Md. 579, 594, 195 A. 576, 584 (1937); *Kemp v. Owens*, 76 Md. 235, 24 A. 606 (1892).

\* \* \*

"Consequently, having voted frequently in the past is not a qualification for voting and, under the Maryland Constitution, could not be a qualification.   The 'inactive' voters who remained on the registration rolls and who continued to

---

**17.**   Article I, §§ 1 and 4 of the Constitution of Maryland provide as follows:

"**Section 1.   Elections to be by ballot;   qualifications of voters;   election districts.**

"All elections shall be by ballot.   Every citizen of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election, shall be entitled to vote in the ward or election district in which he resides at all elections to be held in this State.   A person once entitled to vote in any election district, shall be entitled to vote there until he shall have acquired a residence in another election district or ward in this State."

\* \* \*

"**Section 4.   Right to vote of persons convicted of certain crimes and persons under guardianship.**

"The General Assembly by law may regulate or prohibit the right to vote of a person convicted of infamous or other serious crime or under care or guardianship for mental disability."

meet the constitutional qualifications for voting in Baltimore City, were not 'ineligible' voters."

We went on in the *State Election Bd.* case to explain the only possible legitimate purpose of "purge" provisions like § C–504 of the Ocean City Charter and former Art. 33, § 3–20, of the Maryland Election Code, as follows (342 Md. at 599, 679 A.2d at 102):

"Contrary to the position of the State Board, former Art. 33, § 3–20, did not make voting at least once every five years a condition for continued voter eligibility. Instead, the sole purpose of former § 3–20, as well as present § 3–17A, was to set forth a procedure or remedy by which election boards could remove from the voter registration rolls the names of persons who had died, moved away, or incurred a voting disability under Article I, § 4, of the Constitution."

Consequently, the 128 residents of Ocean City who had not voted in the preceding two general municipal elections, but whose names remained on the voter registration list, were not unqualified voters. In no event should their names be removed from the voter registration list.

If it be assumed, *arguendo,* that all of the other names challenged by Gisriel should be removed from the voter registration list, but with the names of the 128 infrequent voters retained on the list, the number of signatures obtained by Gisriel would still be insufficient to meet the twenty percent requirement imposed by § C–411 of the Charter.[18] Therefore, even under Gisriel's legal theory and allegations, he would not have been entitled to relief.

---

**18.** Subtraction of the 128 infrequent voters from Gisriel's list of allegedly unqualified voters would leave 166 allegedly unqualified voters on the City's registration list. Subtraction of these 166 names from 4,903, the number on the list as of the date Gisriel's referendum petition was filed, would leave 4,737 as the total number of qualified voters. The number of signatures on Gisriel's petition was 947, which, divided by 4,737 equals 19.9%, a figure just shy of the twenty percent necessary to place the ordinance on the ballot.

## B.

■■■ The Court of Special Appeals correctly held that, under this Court's opinions, the voter registration lists are conclusively presumed to be the lists of all qualified voters at any given point in time, as long as reasonable remedies are available periodically to delete from the lists the names of unqualified voters. "[W]hen no fraud or misconduct is charged or imputed to the election officials in registering the voter or in retaining his name, the official registration books become, on the day of election, the list of the only qualified voters of the municipality." *Moore v. Bay,* 149 Md. 286, 293, 131 A. 459, 462 (1925). *See also DuBois v. City of College Park,* 280 Md. 525, 375 A.2d 1098 (1977), *cert. denied,* 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 993 (1983); *Lee v. Sec. of State & Mahoney,* 251 Md. 134, 246 A.2d 562 (1968).[19]

In *Moore v. Bay, supra,* two unsuccessful candidates in a municipal election challenged the validity of the election, alleging that some registered voters participating in the election were not legally qualified to vote because they did not possess all of the necessary qualifications required by the city charter. In rejecting the challenge, this Court concluded that "the final registration lists of voters [is] conclusive evidence of those entitled to vote at the ensuing municipal election." *Moore v. Bay, supra,* 149 Md. at 296, 131 A. at 463. In reaching this conclusion, the Court noted that the local election law prescribed a sufficient plan for the maintenance of the municipality's registration lists, and that, as long as the registration lists were compiled pursuant to this plan, they were conclusive evidence of the municipality's qualified voters.

---

**19.** In addition, Article I, § 2, of the Maryland Constitution states in pertinent part as follows:

"The General Assembly shall provide by law for a uniform Registration of the names of all the voters in this State, who possess the qualifications prescribed in this Article, which Registration shall be conclusive evidence to the Judges of Election of the right of every person, thus registered, to vote at any election thereafter held in this State...."

In *Lee v. Sec. of State & Mahoney, supra,* the plaintiff challenged the right of a candidate to run in a general election as an independent, alleging that the Board of Supervisors of Elections had improperly reopened the voter registration books to allow the candidate to change his party affiliation. This Court pointed out that the state election code prescribed the applicable statutory mechanism by which voter registration lists could be challenged, but that the plaintiff had failed to follow these procedures. Consequently, the Court held that the trial court had properly dismissed the plaintiff's action.

Finally, in *DuBois v. City of College Park, supra,* three students at the University of Maryland, who were duly registered voters of the City of College Park, brought an action for a declaratory judgment that the City's councilmanic districts were unconstitutionally apportioned because the figures upon which the districts were apportioned excluded students residing on the campus of the University of Maryland. It was claimed that the two "student" districts contained two to three times the population of the "non-student" districts. The City argued that the plaintiffs lacked standing to challenge the apportionment because, despite the fact that they were included on the City's registered voter list, they were not "bona fide" city residents. In rejecting the City's standing argument, we pointed out that the College Park Charter had incorporated the state election code's procedures providing for the removal of voters who were either improperly registered or who had become unqualified to vote, and that such remedy was exclusive and could not be by-passed. *DuBois v. City of College Park, supra,* 280 Md. at 533, 375 A.2d at 1104. The Court held that the City "[could] not, merely by moving to dismiss for lack of standing ..., contest the fact that those registered according to the city charter are not qualified voters." *DuBois v. City of College Park, supra,* 280 Md. at 534, 375 A.2d at 1104.

The Court of Special Appeals recognized the important practical considerations underlying the principle applied in the above-discussed cases, when it stated (*Ocean City Board v. Gisriel, supra,* 102 Md.App. at 151, 648 A.2d at 1097–1098):

"The ... effect of [the circuit court's] decision ... is that it allows or sanctions a petitioner, such as [Gisriel] in fact did here, to challenge the voter registration list at anytime after the referendum petition is submitted, *ad infinitum,* so long as the challenges submitted recite a factual premise that the challenged voter was not qualified to vote as of the date the petition was submitted. Notwithstanding the administrative nightmare this 'rolling barrage' scenario would present for the Board, a petitioner also would be disadvantaged as he or she would be unable to ascertain prior to or during the petition signature drive, with any degree of certainty, the number of signatures needed to satisfy the twenty-percent requirement of § C–411. Moreover, while the Board struggles with this potential 'rolling barrage' ... the effectiveness of the petitioned law is suspended indefinitely."

Furthermore, the record in this case shows that Ocean City does have an adequate periodic procedure for culling from the voter registration list the names of those who have died and the names of those who are unqualified. At the meeting of the City Council which afforded Gisriel the opportunity to present his challenges and evidence, the Chairperson of the Board, Mary Adeline Bradford, also testified concerning the Board's procedures. She stated that "our board has a standard procedure for address verifications, deaths, moves, and other voter roll changes in order to protect the voter rights as guaranteed by the United States Constitution." She indicated that the Board had met on ten separate occasions between October 1992 and March 1993, for the purpose of conducting "the ongoing process of maintaining an accurate voter roll for ... Ocean City."

With respect to the particular process utilized by the Board to purge the City's registration list, Ms. Bradford explained:

"Information is sent out and replies are either—come in with the folks saying they've moved or else letters are returned by the post office as undeliverable. And only when we have paper documentation from the individual, can we indeed remove them from the rolls. We have called individuals before the Board ... who we had reason to

believe lived in ... other locations. And they have sworn to us under penalty of perjury that they indeed do live in Ocean City.

\* \* \*

"[W]ith the advent of the universal registration law, this was—the procedures and things were changed.... [W]hen we got the original list [of registered voters of Worcester County] as sent to us by the county and verified by the county as what the true voter rolls of Ocean City should be, it was approximately 7300 names.... We have spent the time since 1990 helping the county understand what streets are actually in Ocean City and what streets actually are not in Ocean City. So we have indeed culled the county list down considerably...."

The Chairperson stated that the Board met on a regular basis in order to conduct an "on-going purge" of the City's registration list, and "[had] the board ... done no work, we would [have] a list of over 7,000 names of registered voters in Ocean City as submitted to us by the Board of Elections of Worcester County in 1990."

■ The record thus shows that the Board has a reasonable procedure for periodically purging unqualified persons from the City's registered voter list.[20] Under our decisions, that procedure is exclusive.

*JUDGMENT AFFIRMED, WITH COSTS.*

---

**20.** We note that the Court of Special Appeals stated that the State Election Code's procedure for challenging the voting qualifications of registered voters was applicable to the instant proceeding. Maryland Code (1957, 1997 Repl.Vol.), Article 33, § 1–1(a)(6), states that "election," as used in Article 33, excludes "any municipal election other than in Baltimore City unless otherwise specifically provided for in [Article 33]." Thus, municipal elections are generally not covered by the provisions of Article 33. *See Hanrahan v. Alterman,* 41 Md.App. 71, 80 n. 12, 396 A.2d 272, 277–278 n. 12 (1979). Moreover, the Court of Special Appeals incorrectly interpreted this Court's holding in *DuBois v. City of College Park,* 280 Md. 525, 375 A.2d 1098 (1977), *cert. denied,* 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 993 (1983), as supporting the application of Article 33, § 3–16, to municipal elections. In *DuBois,* we

simply recognized that the City of College Park had specifically incorporated by reference the procedure in Article 33, § 3–16, into its charter, thereby making § 3–16 the exclusive mechanism for challenging voter qualifications in the city. *DuBois v. City of College Park, supra,* 280 Md. at 532, 375 A.2d at 1103. We are not aware of any prior decisions in this Court where Article 33, § 3–16, has been applied to a municipal election in the absence of specific incorporation by reference in the municipality's charter.

In light of the reasonable procedures actually utilized by the Ocean City Board to maintain an accurate voter registration list, the inapplicability of the state statute to Ocean City elections is of no consequence.